**JERSEY CENTRAL POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Allegheny Electric Cooperative, Inc., et al., Intervenors.

No. 82–2004.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 30, 1986.

Decided Feb. 3, 1987.

As Amended Feb. 3, 1987.

Starr, Circuit Judge, filed concurring opinion.

Mikva, Circuit Judge, filed dissenting opinion in which Wald, Chief Judge, and Spottswood W. Robinson, III and Harry T. Edwards, Circuit Judges, joined.

James B. Liberman, Washington, D.C., with whom Ira H. Jolles, New York City, and Leonard W. Belter were on the brief, for petitioner. Daniel F. Stenger and Scott M. DuBoff, Washington, D.C., also entered appearances, for petitioner.

Jerome M. Feit, Sol., F.E.R.C., with whom William H. Satterfield, General Counsel, and Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., were on the brief, for respondent. Barbara J. Weller, Deputy Sol., F.E.R.C., Washington, D.C., also entered an appearance, for respondent.

Charles D. Gray, with whom Paul Rodgers, Washington, D.C., was on the brief for amicus curiae, Nat. Ass'n of Regulatory Utility Com'rs, urging affirmance.

Robert Weinberg, with whom William I. Harkaway and Harvey Reiter, Washington, D.C., were on the brief, for intervenors, Allegheny Elec. Co-op., Inc., et al.

David M. Barasch, Harrisburg, Pa., was on the brief for amici curiae, Pennsylvania Office of Consumer Advocate, et al., urging affirmance.

Daniel P. Delaney, John F. Povilaitis and Charles F. Hoffman, Harrisburg, Pa., were on the brief for amicus curiae, Pennsylvania Public Utility Com'n, urging affirmance.

Before WALD, Chief Judge, ROBINSON, MIKVA, EDWARDS, RUTH B. GINSBURG, BORK, SCALIA,* STARR, SILBERMAN and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

Concurring opinion filed by Circuit Judge STARR.

Dissenting opinion filed by Circuit Judge MIKVA, with whom Chief Judge WALD and Circuit Judges SPOTTSWOOD W. ROBINSON, III and HARRY T. EDWARDS join.

BORK, Circuit Judge:

Jersey Central Power and Light Company petitions for review of Federal Energy Regulatory Commission orders modifying the electric utility's proposed rate schedules and requiring the company to file reduced rates. Jersey Central charges that it alleged facts which, if proven, show that the reduced rates are confiscatory and violate its statutory and constitutional rights as defined by the Supreme Court in *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Though it is probable that the facts alleged, if true, would establish an invasion of the company's rights, the Commission refused the company a hearing and reduced its rates summarily.

Throughout the extensive proceedings before both the Commission and this court, the Commission has steadfastly maintained that its summary dismissal of Jersey Central's filing was justified by prior Commission precedent. Faced with the claim that the rate order was inconsistent with the Commission's statutory responsibility to provide just and reasonable rates and with the constitutional prohibition against uncompensated takings, the Commission briefs advance a legal theory which, if

* Judge (now Justice) Scalia was a member of the Court at the time this case was argued, but did not participate in this decision.

adopted by this court, would immunize virtually all rate orders from this type of challenge. The Commission's theory flies in the face of every Supreme Court decision that addresses this subject, and we are bound to reject it.

The intervenors, customers of Jersey Central, advance a quite different rationale for affirming the Commission. They attempt to justify the denial of a hearing with the argument that Jersey Central followed the wrong procedures and therefore lost the opportunity to have its substantive claims heard. Thus, it is said, it was the company's fault, not the Commission's, that no hearing was held.

That reasoning provides no basis for affirming the Commission. It fails to come to grips with the character of the Commission decision we review. That decision does not rest on adjective law. The Commission in fact reached and peremptorily decided the merits of the utility's claim. The substantive *Hope Natural Gas* issue is, therefore, squarely before us and cannot be avoided by faulting the utility for employing defective tactics. The Commission ruled that Jersey Central's allegations and proffered testimony would not support a higher rate. That substantive ruling means that a hearing would have been pointless. The ruling is inconsistent with *Hope* as well as with other controlling precedent of the Supreme Court and of this court. Reversal and remand for a hearing are thus required.

Though the fact that the Commission reached the merits renders irrelevant the intervenors' procedural rationale, it should be noted that if procedural fault is to be assigned, it should be laid at the Commission's doorstep. In dealing with Jersey Central's rate filings, the Commission applied unclear rules arbitrarily. Moreover, the Commission made plain, contrary to the intervenors' rationale, that no procedure could have been followed that would have guaranteed the hearing sought. The explanation for what has taken place in these convoluted proceedings appears to be less that Jersey Central followed incorrect procedures than that the Commission resists "end result" examination at the agency level, and is deeply antagonistic to court review of ratemaking under the guidelines laid down by *Hope.*

The decision of the Commission is vacated and the case remanded for a hearing at which Jersey Central may finally have its claim addressed.

### I.

This case has already prompted two opinions from this court, both of which we have since vacated. *See Jersey Central Power & Light Co. v. FERC,* 730 F.2d 816 (D.C. Cir.1984) ("*Jersey Central I*"); *Jersey Central Power & Light Co. v. FERC,* 768 F.2d 1500 (D.C.Cir.1985) ("*Jersey Central II*"). The case has now been reheard *en banc,* and the court has had the benefit of supplemental briefing and oral argument from the parties, the intervenors, and several *amici curiae.*[1]

On March 31, 1982, Jersey Central filed proposed rate schedules with the Commission for wholesale service to six customers. Jersey Central divided its filing into two separate rate increases designated Phase A and Phase B. Phase A has gone into effect, and Phase B is the subject of this litigation.

At issue is the utility's proposed treatment of the $397 million investment lost when it suspended construction of its nuclear generating station at Forked River, New Jersey. The Forked River project was initiated about a decade and a half ago, when federal and state agencies were encourag-

---

1. Supplemental briefs were filed by petitioner Jersey Central Power and Light Company, by respondent FERC, by intervenors Allegheny Electric Cooperative, Inc. and the New Jersey Boroughs of Butler, Lavallette, Pemberton, and Seaside Heights, and by four amici: the Pennsylvania Public Utility Commission, the Nation-

al Association of Regulatory Commissioners ("NARUC"), the Pennsylvania Office of Consumer Advocate, and the National Association of State Utility Consumer Advocates. Oral argument was presented by the parties and intervenors, and by NARUC.

ing utilities to commit substantial amounts of capital to nuclear generating plants that required lead times of eight to twelve years. The consensus prediction was of substantial and steady increases in the demand for electricity and substantial and continued increases in the price of oil due to the operation of an international oil cartel. Regulated public utilities are under statutory obligations to plan and build the facilities necessary to meet the projected needs of their customers. *See, e.g.,* 16 U.S.C. § 824a(g) (1982); N.J.Stat.Ann. 48:3–3 (West 1969). If firms and households were not to face catastrophic energy prices in the future, it was thought essential that nuclear generating plants be built. All parties agree that Jersey Central's investment at Forked River was prudent when made.

The forecasts of both demand and supply proved wrong. Due to conservation, demand did not rise nearly as much as expected, and, with the collapse of the international cartel, the oil market has experienced a world-wide glut and a dramatic decline in prices. Furthermore, the protracted litigation and political controversy which attended the construction of nuclear power projects resulted in extensive delays and dramatic increases in their ultimate cost. Thus, many investments which were prudent, indeed considered essential, when made, have now by necessity been cancelled. Forked River was one, and in 1980 Jersey Central abandoned it, having concluded "that it must devote whatever resources it had available to ... less capital intensive and more politically acceptable alternatives." Testimony of Dennis Baldassari at 7, Joint Appendix ("J.A.") at 34.

Jersey Central sought to recover the cost of the Forked River investment by amortizing the $397 million over a fifteen-year period, a proposal to which the Commission agreed. Jersey Central also requested, however, that the unamortized portions be included in the rate base, with a rate of return sufficient to cover the carrying charges on the debt and the preferred stock portions of that unamortized investment. Jersey Central expressly did *not* seek a return on that portion of the unamortized investment allocable to its common equity investors.

In support of its proposal, Jersey Central submitted to the Commission the testimony of Dennis Baldassari, its Vice-President and Treasurer. J.A. at 28–39. Baldassari sought to demonstrate that the financial problems faced by Jersey Central made necessary earnings and revenues at the level contemplated by its filing. Baldassari characterized the utility's financial condition as "delicate." Testimony of Dennis Baldassari at 9, J.A. at 36. Jersey Central was wholly dependent for short-term credit, he explained, on a Revolving Credit Agreement which was subject to termination at any time. The only long-term securities it was able to issue were themselves subject to mandatory repurchase by the utility should the short-term credit then available to it be for any reason terminated. Jersey Central's credit standing was, therefore, predictably low. Standard & Poor's Corporation rated its senior debt securities "BB–", *i.e.,* "regarded, on-balance, as predominantly speculative with respect to capacity to pay interest and repay principal in accordance with the terms of the obligation." Moody's Investors Service had also downgraded Jersey Central's rating, classifying its securities "Ba", *i.e.,* "judged to have speculative elements; their future cannot be considered as well-assured. Often the protection of interest and principal payments may be very moderate, and thereby not well safeguarded during both good and bad times over the future. Uncertainty of position characterizes bonds in this class." *Id.* at 4, J.A. at 31.

Jersey Central's lack of access to long-term capital, and the precariousness of its short-term credit, placed it in serious financial difficulty. Baldassari described the rate increase requested as "the minimum amount necessary to restore the financial integrity of the Company thereby providing the means by which Jersey Central will be able to meet its obligation to provide safe and dependable service in the future." Testimony of Dennis Baldassari at 12, J.A.

at 39. The focus of his testimony, therefore, was on the overall rate necessary to preserve his company's access to capital markets and its financial integrity.

The Commission responded by issuing an order summarily excluding the unamortized portion of the investment from the rate base. Order Accepting for Filing and Suspending Revised Rates, Granting Interventions, Granting in Part and Denying in Part Motions for Summary Disposition, and Establishing Procedures, 19 F.E.R.C. (CCH) ¶ 61,208 (May 28, 1982). No discussion or analysis accompanied this portion of the order. The Commission simply noted that "consistent with Commission precedent ... unamortized investment in cancelled plants must be excluded from rate base." *Id.* at 61,403 (footnote omitted). The precedent to which the Commission referred was *New England Power Co.*, 8 F.E.R.C. (CCH) ¶ 61,054 (July 19, 1979), *aff'd sub nom. NEPCO Municipal Rate Comm. v. FERC*, 668 F.2d 1327 (D.C.Cir. 1981), *cert. denied sub nom. New England Power Co. v. FERC*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982) ("*NEPCO*"). The utility in *NEPCO* had been permitted to recover the costs of its failed investment by amortizing it over a five-year period, but was denied its request to include the unamortized portion in the rate base.

NEPCO's proposal differed from that later made by Jersey Central in several respects. NEPCO's requested amortization period was only one-third as long as that proposed by Jersey Central; NEPCO proposed a full return on the unamortized portion of the investment, including that allocable to common equity, as opposed to simply a return sufficient to cover the carrying charges on debt and preferred stock portions; and NEPCO never alleged that its financial integrity and its ability to maintain access to capital markets depended upon the rate it was requesting.

Upon receiving the Commission's order, Jersey Central filed an Application for Rehearing, J.A. at 99–135, seeking a full evidentiary hearing in which its proposal, and the factual foundation supporting it, could be examined. Jersey Central argued that NEPCO did not control because the allocation of risk in Jersey Central's proposal was different from, and more favorable to consumers than, the allocation proposed and rejected in *NEPCO*. Jersey Central argued as well that more recent Commission precedent on the treatment of abandoned investments in gas pipeline facilities provided support for its proposal. Finally, Jersey Central advanced a position that became the central issue briefed and argued in this appeal. It is axiomatic that the end result of Commission rate orders must be "just and reasonable" to both consumers and investors, and that, in achieving this balance, the Commission must consider the impact of its rate orders on the financial integrity of the utility. Jersey Central argued that, for these reasons, the Commission may not *summarily* exclude an investment from the rate base when the utility has alleged that its ability to attract capital will be seriously jeopardized as a result. Jersey Central contended that it was entitled to a hearing at which it would have the opportunity to prove its allegations and demonstrate that the end result of the Commission's orders violated the applicable statutory and constitutional standards, a hearing that would create a record through which the Commission's effort to balance the relevant consumer and investor interests would be subject to judicial review.

Alternatively, since Jersey Central's concern was with the end result of the rate order, it requested an evidentiary hearing at which it could justify a rate of return higher than that included in its original filing to compensate for the rate base limitation that the agency claimed was necessitated by Commission precedent. The rate allowed a utility is the sum of (1) its cost of service, and (2) its rate base multiplied by its rate of return. Since the Commission's order had excluded Forked River from the rate base, Jersey Central suggested that the necessary rate could be achieved through raising the rate of return.

The Commission again refused to grant Jersey Central a hearing. The Commission explained, somewhat cryptically:

> We recognize that, in accord with *Hope Natural Gas Co., supra,* it is the "end result" which must be just and reasonable. Nonetheless, the reasonableness of that end result cannot be evaluated without regard to the individual components which comprise a rate....
>
> ... JCP & L's argument that our decision to exclude cancelled project costs from rate base is not mandated by Commission precedent is ... without merit. Furthermore, the argument that a hearing is required in order to implement this policy determination, is erroneous. Since Opinion No. 49, the Commission has consistently resolved this issue through summary disposition.

Order Granting in Part and Denying in Part Application for Rehearing, 20 F.E. R.C. (CCH) ¶ 61,083, at 61,181–82 (July 23, 1982) (footnote omitted). The Commission then denied the request for a hearing on the alternative proposal of a higher rate of return, on the grounds that modifying the filing at that stage would unfairly present the Commission and the intervenors with a "moving target," and, further, that Jersey Central's "case-in-chief contain[ed] no testimony or exhibits which would support a higher return." *Id.* at 61,182. When the Commission denied Jersey Central's Application for Rehearing and Reconsideration as well, this appeal was filed.

A unanimous panel of this court affirmed the Commission. The utility claimed that the Commission's orders were not the product of reasoned decisionmaking because they were inconsistent with the gas pipeline cases and because application of the *NEPCO* precedent to the facts of this case was irrational. The utility also claimed that it was entitled to an evidentiary hearing in which it could justify its alternative request for a higher rate of return. All these claims were rejected. We then turned to Jersey Central's contention that *Hope Natural Gas* required that there be a hearing to ensure that the "end result" of the rate order was "just and reasonable."

The path we took in resolving this issue was later challenged by *both* parties:

> Jersey Central argues that, as a result of the Commission's orders, its rate of return overall will be too low to be characterized as "just and reasonable." In denying rehearing, however, the Commission responded that "the reasonableness of that end result cannot be evaluated without regard to the individual components which comprise a rate." Commission Order at 61,181. This is a rather terse explanation and we wish that in the future the Commission would share its undoubted expertise with us a bit more generously. We understand the Commission to be saying, however, that the end result is to be judged by the rate of return allowed on items for which a rate of return is allowable, the Forked River expenditure is not such an item, and the rates are just and reasonable as to those cost items that are properly in the rate base. The dispute thus boils down to the question of whether the end result test is to be applied to a utility overall or only to those assets which valid Commission rules permit to be included in the rate base.

*Jersey Central I,* 730 F.2d at 823. Having thus defined the dispute, we accepted what we thought to be the Commission's position and concluded that the end result test applied only "to those assets which valid Commission rules permit to be included in the rate base."

In its petition for rehearing before this court, Jersey Central stated that we had mischaracterized the "end result" test by focusing not on the result of the rate order but on the determination of the rate base, which is only one component of that order. We asked the Commission for a response, and it provided one we found incomprehensible:

> In the Commission's view the Court characterized the "end result" test more narrowly than the Commission would have; and, accordingly, it believes it would be appropriate for the Court to amend this aspect of its opinion. Nevertheless, the

Commission believes the Court properly affirmed the Commission's orders in this case, since it is well-settled that the end-result test only has application to items which are legitimately included in the rate base as "used and useful." Response of Respondent FERC to Petition for Rehearing at 2. Since this response seemed both to reject and accept our reasoning, the Commission had still not offered us any guidance as to how it construed *Hope*'s "end result" test. Dissatisfied, the court entered a further order which read, in pertinent part:

[W]e direct the Commission to elaborate on its cryptic comment that, "[i]n the Commission's view the Court characterized the 'end result' test more narrowly than the Commission would have; and, accordingly, it believes it would be appropriate for the Court to amend this aspect of its opinion." Response at 2. This statement is unhelpful. The Commission should explain how and why it believes that the opinion should be amended. We therefore order that the Commission provide further explanation of its position in the brief we have today directed it to file. Throughout these proceedings the court has found the Commission's submissions singularly terse and uninformative.

Order of July 16, 1984. The Commission filed a second response in which it now agreed with Jersey Central that the end result test does not only apply to those assets which valid Commission rules permit to be included in the rate base. Brief for Respondent FERC in Response to the Court's Order of July 16, 1984, at 4. The second response described the "end result" test as "simply an expression for broadly gauging whether, based on all the facts before it, the Commission's orders in a particular case produce a reasonable result." *Id.* at 5. The Commission nevertheless suggested that the end result test was not a standard under which a court was authorized to set aside an unjust end result, but rather "was designed to accord the Commission broad discretion over all aspects of rate-making methodology." *Id.* at 6.

This response meant that the "end result" test applied to the overall situation produced by the Commission's action but that the Commission not only refused to hold a hearing on that subject but also believed its refusal to be virtually immune from judicial review. Finding no support for the arresting proposition that the Commission was immune from challenges in court over rate orders alleged to violate statutory and constitutional guarantees explicated by the Supreme Court, the panel— now divided—vacated its prior decision. Jersey Central had alleged that "for four years [it] had been unable to pay any dividends on its common stock"; that in part as a consequence of the Commission's orders it had been "repeatedly on the edge of being forced into bankruptcy"; and that since 1979 it

has had no access to the long-term capital markets and has been wholly dependent upon a short-term revolving credit agreement which was subject to termination at a moment's notice. [The company] has been allowed sufficient cash flow to enable [it] to avoid bankruptcy (but not to provide earnings [sufficient] to enable [it] to attract capital or maintain credit).

Petition for Rehearing and Suggestion for Hearing En Banc at 14. Since the Commission had never held a hearing, there was no way of knowing whether these allegations were true, but we noted that if they were, it "would suggest that FERC's actions were illegal under the end result test of *Hope Natural Gas*," *Jersey Central II*, 768 F.2d at 1502, because the Commission might well have failed to achieve "a reasonable balancing of investor and consumer interests in keeping with the requirement that rates be 'reasonable, just, and non-discriminatory.'" *Id.* at 1503. We therefore remanded the case to the Commission for a hearing at which Jersey Central would have the opportunity to present its evidence on the inadequacy of the rates allowed it. *Jersey Central II* was vacated when a majority of the court voted to rehear this case *en banc*.

## II.

### A.

The parties offer radically differing views of the Commission's obligations under *Hope Natural Gas,* a decision in which the Supreme Court set forth the applicable standard of judicial review when rates ordered by an agency are challenged in court as failing to meet the statutory requirement that they be "just and reasonable." The *Hope* Court was construing the Natural Gas Act of 1938, §§ 4(a), 5(a), 52 Stat. 821, 822, 823–24 (codified as amended at 15 U.S.C. §§ 717c(a), 717d(a) (1982)). The Federal Power Act, 16 U.S.C. § 824d(a) (1982), the source of the claim in this case, also requires that rates be "just and reasonable," and courts rely interchangeably on cases construing each of these Acts when interpreting the other. *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 2930 n. 7, 69 L.Ed.2d 856 (1981). Since the Court had previously indicated that "the Congressional standard prescribed by this statute coincides with that of the Constitution," *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942), the *Hope* test defines the point at which a rate becomes unconstitutionally confiscatory as well.

In these proceedings the Commission itself has never stated what the "end result" test of *Hope Natural Gas* requires of it or of a reviewing court. In *Jersey Central I* and *II,* the Commission's appellate counsel offered us only the vague statements of the Commission's duties already quoted. As to the reviewing court's power under *Hope,* counsel told the panel in those proceedings essentially that the reviewing court had little, if any, function to perform. However, at oral argument before the court *en banc,* counsel finally advanced the novel proposition that the "end result" test empowers a court to set aside a rate order on the utility's petition only if the order would put the utility into bankruptcy. In order to show how dramatically at odds with the law that position is, we review the history of the doctrine at issue.

*Hope Natural Gas* reaffirmed a doctrinal shift, begun in *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942), away from the more exacting and detailed standard of judicial review exemplified by *Smyth v. Ames,* 169 U.S. 466, 185 S.Ct. 418, 42 L.Ed. 819 (1898). Under *Smyth v. Ames,* courts had meticulously scrutinized rate orders to ensure that investors received the "fair value" of the property dedicated to public use. The "fair value" standard required courts to estimate the current market value of the property, and rates that provided anything less were deemed confiscatory. The governing theory required that consumers pay the market value of the property they were using because the property was regarded as having been taken. Recovery was therefore required only on property "used and useful" to the public, for property that was not being used could not be considered to have been taken. The Supreme Court cases of the 1940's eliminated the requirement that the market value of the property be recovered, and regulated industries now collect rates calculated to generate a reasonable return on the *original cost* of the investment. The companies are still generally permitted to include in the rate base only property considered used and useful, but with the demise of "fair value," "used and useful" ceased to have any constitutional significance, and the Commission has at times departed from this standard. It is now simply one of several permissible tools of ratemaking, one that need not be, and is not, employed in every instance. *See Washington Gas Light Co. v. Baker,* 188 F.2d 11 (D.C.Cir.1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951).

In setting aside the rigorous judicial scrutiny that had previously characterized review of rate orders, the Supreme Court substituted a far more deferential standard of review:

> Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have

been overstepped. If the Commission's order, as applied to the facts before it and reviewed in its entirety, produces no arbitrary result, our inquiry is at an end. *FPC v. Natural Gas Pipeline Co.*, 315 U.S. at 586, 62 S.Ct. at 743. This new emphasis—on whether the order "viewed in its entirety" was the product of "proper findings" and was not "arbitrary"—evolved two years later into the "end result" test of *Hope Natural Gas.*

The *Hope* Court made clear that when a rate was claimed to be beyond "just and reasonable" boundaries, the focus of analysis was to be the end result of that order:

> [I]t is the result reached not the method employed which is controlling.... It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.... And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

320 U.S. at 602, 64 S.Ct. at 287 (citations omitted). Judging a rate order's consequences, the Court held, necessarily required a "balancing of the investor and the consumer interests." *Id.* at 603, 645 S.Ct. at 288. The legitimate investor interest, which is the interest Jersey Central claims received inadequate attention in the proceedings before the Commission, was defined in *Hope* to include:

> the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock.

*Id.* The return, therefore, "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Id.*

Thus, in reviewing the rate order challenged in *Hope,* the Court considered the detailed findings made by the Commission concerning the financial condition of Hope Natural Gas Company. 320 U.S. at 603–05, 64 S.Ct. 288–89. After examining all of the relevant figures, the Commission had concluded that "[t]he company's efficient management, established markets, financial record, affiliations, and its prospective business place it in a strong position to attract capital upon favorable terms when it is required." 44 P.U.R. (N.S.) 1, 33 (1942), *quoted in Hope,* 320 U.S. at 605, 64 S.Ct. at 289. After summarizing the Commission's findings and conclusions concerning the company's financial health, the Court held:

> In view of these various considerations we cannot say that an annual return of $2,191,314 is not "just and reasonable" within the meaning of the Act. Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called "fair value" rate base.

320 U.S. at 605, 64 S.Ct. at 289.

In *Hope Natural Gas,* the rate was challenged as too low to account adequately for the legitimate interests of the investor. In *Washington Gas Light Co. v. Baker,* 188 F.2d 11 (D.C.Cir.1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951), this court heard a challenge by a consumer who claimed that a rate increase approved by the Public Utilities Commission of the District of Columbia was too high to account adequately for the legitimate interests of the purchaser. The court applied the same analytical framework. Because the local public utilities commission was governed by the same standard as the Federal Power Commission, 188 F.2d at 14, Judge Bazelon's opinion examined the rate order under the rule set forth in *Hope Natural Gas:*

> So long as the public interest—i.e., that of investors and consumers—is safeguarded, it seems that the Commission

may formulate its own standards. But there are limits inherent in the statutory mandate that rates be "reasonable, just, and nondiscriminatory." Among those limits are the minimal requirements for protection of investors outlined in the Hope case. And from the earliest cases, the end of public utility regulation has been recognized to be protection of consumers from exorbitant rates. Thus, there is a zone of reasonableness within which rates may properly fall. It is bounded at one end by the investor interest against confiscation and at the other by the consumer interest against exorbitant rates.

*Id.* at 15 (footnotes omitted). The court then set aside the rate order and remanded for further proceedings, on the ground that the Commission had not made sufficiently detailed findings of fact concerning the financial health of the company involved to support the reasonableness of its rate increase. "Despite the broad limits allowed the Commission, it remains imperative that its findings, under whatever formula adopted, be based upon substantial evidence in the record." *Id.* (footnote omitted). In that case, this court also indicated that the Commission was not obligated to exclude from the rate base all property not presently "used and useful," but was free to include prudent but cancelled investments. *Id.* at 19.

The Supreme Court has repeatedly reaffirmed the "end result" standard of *Hope Natural Gas. See, e.g., FPC v. Memphis Light, Gas & Water Division,* 411 U.S. 458, 474, 93 S.Ct. 1723, 1732, 36 L.Ed.2d 426 (1973) ("under *Hope Natural Gas* rates are 'just and reasonable' only if consumer interests are protected and if the financial health of the pipeline in our economic system remains strong"); *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 605, 65 S.Ct. 829, 840, 89 L.Ed. 1206 (1945) ("end result" test "is not a standard so vague and devoid of meaning as to render judicial review a perfunctory process. It is a standard of finance resting on stubborn facts."). In *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968),

the Court reviewed Commission orders setting area-wide rates for gas producers. Writing for the majority, Justice Harlan stated that a court reviewing rate orders must assure itself *both* that "each of the order's essential elements is supported by substantial evidence" *and* that "the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable." *Id.* at 792, 88 S.Ct. at 1373. In examining the end result of the rate order, he made clear, a court cannot affirm simply because each of the component decisions of that order, taken in isolation, was permissible; it must be the case "that they do not *together* produce arbitrary or unreasonable *consequences." Id.* at 800, 88 S.Ct. at 1377 (emphasis added). The Court in *Permian Basin* emphasized the necessity for Commission findings, the existence of which is a necessary predicate to judicial deference:

> The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry.

*Id.* at 792, 88 S.Ct. at 1373. And the Court once again reviewed the findings below and affirmed upon concluding that "the record before the Commission contained evidence sufficient to establish that these rates, as adjusted, will maintain the industry's credit and continue to attract capital." *Id.* at 812, 88 S.Ct. at 1383.

The teaching of these cases is straightforward. In reviewing a rate order courts must determine whether or not the

end result of that order constitutes a reasonable balancing, based on factual findings, of the investor interest in maintaining financial integrity and access to capital markets and the consumer interest in being charged non-exploitative rates. Moreover, an order cannot be justified simply by a showing that each of the choices underlying it was reasonable; those choices must still add up to a reasonable result. Because the language of these cases is so plain, and the standard applied in each is the same, the preceding lengthy account may have appeared unduly repetitious. We have set out guiding precedent comprehensively, however, because the legal position taken by the Commission is at odds with every one of the requirements specified by these decisions.

In the face of a serious *Hope* challenge, the Commission made no findings, performed no balancing, offered no reasoned consideration of Jersey Central's allegations and proffered testimony, misstated the law by saying that the reasonableness of the end result cannot be evaluated without regard to the individual components that go into a rate, and, most recently, claimed that our reviewing function was ended if the rate order did not cast Jersey Central into bankruptcy.

This performance alone would justify reversal and a remand for a *Hope* hearing. But there was more: the Commission reached the merits and ruled that Jersey Central's allegations and testimony did not even raise a *Hope* issue. That was plain legal error.

### B.

██ The allegations made by Jersey Central and the testimony it offered track the standards of *Hope* and *Permian Basin* exactly. The *Hope* Court stated that the return ought to be "sufficient to ensure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital," and that "it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock." 320 U.S. at 603, 64 S.Ct. at 288. *Permian Basin* reaffirmed that the reviewing court "must determine" whether the Commission's rate order may reasonably be expected to "maintain financial integrity" and "attract necessary capital." 390 U.S. at 792, 88 S.Ct. at 1373. Jersey Central alleged that it had paid no dividends on its common stock for four years and faced a further prolonged inability to pay such dividends. Baldassari's testimony explained that the company was unable to sell senior securities; that its only source of external capital was the Revolving Credit Agreement, which was subject to termination and which placed the outstanding bank loans the company was allowed to maintain below the level necessary for the upcoming year; that the need to pay interest on the company's debt and dividends on its preferred stock meant that common equity investors not only were earning a zero return, but were also forced to pay these interest costs and dividends and that "continued confiscation of earnings from the common equity holder ... will prolong the Company's inability to restore itself to a recognized level of credit worthiness"; that its "inability to realize fully its operating and capital costs so as to provide a fair rate of return on its invested capital has pushed its financial capability to the limits"; that "[a]dequate and prompt relief is necessary in order to maintain the past high quality of service"; and that the rate increase requested was "the minimum necessary to restore the financial integrity of the Company." Testimony of Dennis Baldassari at 5–6, 7, 10, 12, J.A. at 32–33, 34, 37, 39.

Inexplicably, the Commission ruled that Jersey Central's showing did not require a hearing because there were "no testimony or exhibits which would support a higher return." That ruling is flatly at odds with *Hope* and *Permian Basin*. Moreover, the Commission, having held no hearing, made no findings in support of its ruling and gave not a single reason for it. If the Commission and this court are bound by

Supreme Court precedent, and we are, the Commission's ukase cannot stand.

### C.

The Commission's apparent understanding of *Hope Natural Gas,* adopted by the dissent in *Jersey Central II,* is that the "end result" test acts only as a limitation of, and not at all as an authorization for, judicial review of rate orders. While the Commission *"may* also look to the criteria of *Hope* in determining whether its rate order is just and reasonable and *may* make pragmatic adjustments based on the perceived need to balance investor and consumer interests," Brief on Rehearing En Banc for Respondent FERC at 16 (emphasis added), it apparently considers a decision whether or not to do so completely within its discretion. While the Commission's briefs have never explicitly claimed that courts are without authority to set aside rate orders deemed unjust and unreasonable in their consequences, or based upon insufficient findings, at no point in response to our numerous requests for briefing has the Commission indicated any role it believes proper for courts to play in reviewing the reasonableness of rate orders, save that of passively affirming them. Only at oral argument before the *en banc* court did Commission counsel concede that a court might set aside a rate order under *Hope* if the order would drive the company into bankruptcy, but that was the limit of the judicial power acknowledged.

The rationale for the Commission's position is difficult to discern, for, as noted in Section IIA, *supra,* that position can derive no support from the case law it purports to embody. The Commission, it appears, rests its theory in part on the fact that *Hope Natural Gas* represented a shift from strict to deferential judicial review, and, in the historical context in which it was decided, constituted a limitation on judicial review when compared to the standard it was replacing. But judicial review, while limited, was not eliminated, and the "end result" standard—like any standard of judicial review—confines judicial power

not by eliminating review but by defining its reach. The delineation marked by the "end result" test thus simultaneously authorizes and constrains the courts that apply it. This is elementary jurisprudence.

The Commission also apparently locates support in language set forth in *Hope:* "If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." *Hope,* 320 U.S. at 602, 64 S.Ct. at 288. *See also Jersey Central II,* 768 F.2d at 1511 (Mikva, J., dissenting). The Commission's litigating stance appears to interpret the Court's statement as if it were but one half of a larger proposition the Court meant to enunciate: judicial review is at an end if *either* the end result is just and reasonable *or* if it is not. Had he meant any such thing, Justice Douglas would simply have said that there is no more judicial review. Instead, he said that "he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid *because* it is unjust and unreasonable in its consequences." *Hope,* 320 U.S. at 602, 64 S.Ct. at 288 (emphasis added). He then went on to review the financial situation of the company, an exercise that would have been wholly superfluous if he had just announced the demise of judicial review. If the contrary view apparently embraced by the Commission were adopted, the end result standard would become "so vague and devoid of meaning as to render judicial review a perfunctory process." *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 605, 65 S.Ct. 829, 840, 89 L.Ed. 1206 (1945).

The Commission maintains that because excluding the unamortized portion of a cancelled plant investment from the rate base had previously been upheld as *permissible,* any rate order that rests on such a decision is unimpeachable. But that would turn our focus from the end result to the methodology, and evade the question whether the component decisions together produce just and reasonable consequences. We would be back with the assertion made in *Jersey Central I* that "the end result test is to be

applied ... only to those assets which valid Commission rules permit to be included in the rate base." 730 F.2d at 823. That statement was one which neither party endorsed. It was incorrect. The fact that a particular ratemaking standard is generally permissible does not *per se* legitimate the end result of the rate orders it produces. Justice Harlan said just that in *Permian Basin.*

■ The position presented on behalf of the Commission, as we earlier observed, shifted to a minor extent during the course of these proceedings. At oral argument before the *en banc* court, counsel for the Commission indicated that the "end result" test *did* allow a court to set aside a rate order when the company would otherwise go bankrupt and the Commission had refused to take that into account. The source of this constricted standard is elusive, not to say invisible. *Hope Natural Gas* talks not of an interest in avoiding bankruptcy, but an interest in maintaining access to capital markets, the ability to pay dividends, and general financial integrity. While companies about to go bankrupt would certainly see such interests threatened, companies less imminently imperiled will sometimes be able to make that claim as well. Jersey Central alleges that it is such a company. The contention that no company that is not clearly headed for bankruptcy has a judicially enforceable right to have its financial status considered when its rates are determined must be rejected.

The dissent agrees with the Commission that *Hope* stands generally for a restriction on judicial review of a rate order, but erects its own constricted standard to determine when a company may obtain consideration of its financial status in review of a rate order. According to the dissent, Jersey Central could get a *Hope* hearing only by first making a sufficient showing on three critical points: that a "critical nexus" exists between the rate order and the utility's financial plight; that the proposed rate filing would not lead to the exploitation of consumers; *and* that the

overall return allowed on this project is not reasonable, and thus puts the company in need of protection at this phase of the ratemaking process. Dissent at 1205–09. It is remarkable that the dissent would affirm the Commission on a legal theory that neither the Commission nor its counsel ever advanced. The Commission offered no legal theory and counsel offered the unique bankruptcy-only theory. It is impossible to affirm on the basis of the Commission's silence or counsel's rationale. It should be equally impossible to suggest affirmance on the basis of a legal theory never surfaced until today. Indeed, the only correspondence between the three different positions taken by the Commission, its counsel, and the dissent, aside from their common hostility to *Hope*, is that none of them has any basis in any decision of any previous court. The dissent's new three-part barrier flatly ignores the factors that, according to the Supreme Court's controlling opinion in *Hope*, would necessitate an "end result" hearing into whether any revision of a rate order is necessary in light of a company's financial plight. Since Jersey Central submitted figures and testimony to support its claim that the rate order caused its financial distress, that its proposed rates would not exploit consumers, and that the overall rate of return allowed is not just and reasonable, one can only suppose that the dissent demands proof beyond doubt of its three criteria before the hearing is even held. That, most certainly, is not what *Hope* requires. The dissent thus joins the Commission in rejecting the Supreme Court's law.

■ In addition to prohibiting rates so low as to be confiscatory, the holding of *Hope Natural Gas* makes clear that exploitative rates are illegal as well. If the inclusion of property not currently used and useful in the rate base automatically constituted exploitation of consumers, as one of the *amici* maintains, then the Commission would be justified in excluding such property summarily even in cases where the utility pleads acute financial distress. A regulated utility has no constitu-

tional right to a profit, *see FPC v. Natural Gas Pipeline Co.*, 315 U.S. at 590, 62 S.Ct. at 745, and a company that is unable to survive without charging exploitative rates has no entitlement to such rates. *Market Street Ry. v. Railroad Comm'n of Cal.*, 324 U.S. 548, 65 S.Ct. 770, 89 L.Ed. 1171 (1945). But we have already held that including prudent investments in the rate base is not in and of itself exploitative, *Washington Gas Light Co. v. Baker*, and no party has denied that the Forked River investment was prudent. Indeed, when the regulated company is permitted to earn a return not on the market value of the property used by the public, *see Smyth v. Ames*, but rather on the original cost of the investment, placing prudent investments in the rate base would seem a more sensible policy than a strict application of "used and useful," for under this approach it is the investment, and not the property used, which is viewed as having been taken by the public. The investor interest described in *Hope*, after all, is an interest in return on *investment*. *Hope*, 320 U.S. at 603, 64 S.Ct. at 288.[2]

The central point, however, is this: it is impossible for us to say at this juncture whether including the unamortized portion of Forked River in the rate base would exploit consumers *in this case*, or whether its exclusion, *on the facts of this case*, constitutes confiscation, for no findings of fact have been made concerning the consequences of the rate order.[3] Nor, for the same reason, can we make a judgment about the higher rate of return the utility sought as an alternative to inclusion in the rate base of its unamortized investment. Jersey Central has presented allegations which, if true, suggest that the rate order almost certainly does not meet the requirements of *Hope Natural Gas*, for the company has been shut off from long-term capital, is wholly dependent for short-term capital on a revolving credit arrangement that can be cancelled at any time, and has been unable to pay dividends for four years. In addition, Jersey Central points out that the rates proposed in its filing would remain lower than those of neighboring utilities, *see, e.g.*, Petition for Rehearing and Suggestion for Hearing En Banc at 8, which at least suggests, though it does not demonstrate, that the proposed rates would not exploit consumers. The Commission treated those allegations as irrelevant and hence has presented us with no basis on which to affirm its rate order. The necessary findings are simply not there for us to review. When the Commis-

2. We have been reminded by the Commission and several of the *amici* that utilities ought not be immunized from the free play of market forces. Their application of this principle is peculiarly selective. Had the international oil cartel *not* collapsed, and had Forked River provided unusually inexpensive energy in a time of scarcity and high demand, Jersey Central would have received no windfall, but simply the standard return on its original investment. It seems odd, therefore, that it must bear so disproportionate a share of the loss when the prudent investment it made pursuant to its statutory obligations fails.

3. We emphasize that we do not hold that a taking occurs every time a prudent investment is made but not included in the rate base. We thus explicitly reject the dissent's contention that under our holding "the investor is guaranteed a return on his investment, if prudent when made." Dissent at 1212. Whether or not such an approach might be desired as a matter of policy, our holding simply follows *Hope*. Under *Hope*, as we have stated repeatedly, the only

circumstance under which there is a possibility of a taking of investors' property by virtue of rate regulation is when a utility is in the sort of financial difficulty described in Justice Douglas' opinion. If a utility is in that state, the Commission must inquire whether a reasonable return—on investment, not on facilities—has been afforded to investors, taking into account whether any higher return would amount to exploitation of consumers. Under those circumstances, it may be permissible or even proper to grant the utility a greater return on its prudent investments than it otherwise would have received. But absent the sort of deep financial hardship described in *Hope*, there is no taking, and hence no obligation to compensate, just because a prudent investment has failed and produced no return. And even where the sort of deep financial hardship described in *Hope* is present, the utility is entitled only to an "end result" hearing, and is not entitled to any greater return on its investments unless it shows at the hearing both that the rate was unreasonable and that a higher return would not exploit consumers.

sion conducts the requisite balancing of consumer and investor interests, based upon factual findings, that balancing will be judicially reviewable and will be affirmed if supported by substantial evidence. That is the point at which deference to agency expertise will be appropriate and necessary. But where, as here, the Commission has reached its determination by flatly refusing to consider a factor to which it is undeniably required to give some weight, its decision cannot stand. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).[4] The case should therefore be remanded to the Commission for a hearing at which the Commission can determine whether the rate order it issued constituted a reasonable balancing of the interests the Supreme Court has designated as relevant to the setting of a just and reasonable rate.[5]

## III.

The intervenors, Allegheny Electric Cooperative and four boroughs of New Jersey, all purchasers of energy from Jersey Central, present an argument different from that advanced by the Commission. Intervenors urge that we affirm the Commission on the sole ground that Jersey Central made the wrong filing. The dissent agrees.

The argument made by the dissent and the intervenors is purely procedural. They assert that the Commission has a "rule" against including the unamortized portion of an abandoned investment in the rate base; that Jersey Central "ignored" this "rule" when it made its filing; that Jersey Central could have "received what it wanted"—*i.e.*, a hearing before the Commission on its *Hope* claim—had it filed instead a request for a higher rate of return or a shorter amortization period; that those filings, in contrast to the filing actually made, would have been consistent with Commission rules; and that Jersey Central has therefore forfeited whatever claim it might have had to a higher rate, and, accordingly, that the summary dismissal ought to be affirmed. Supplementary Brief Submitted by Intervenors at 9–11, 14–15.

This procedural rationale, it is worth noting, was never advanced by the Commis-

---

**4.** This case thus raises completely different issues from those decided in *Pennsylvania Elec. Co. v. Pennsylvania Pub. Util. Comm'n*, 509 Pa. 324, 502 A.2d 130 (1985). The appeal from that decision was dismissed for want of a substantial federal question. In *Pennsylvania Elec. Co.*, as in this case, a public utility commission ordered the costs associated with an abandoned nuclear plant excluded from the participating companies' rate bases. However, when those companies filed complaints alleging that the rates were not just and reasonable and tariffs seeking rate increases, they were given a hearing and a rate increase—although not as large a one as they had requested.

They therefore appealed. The Pennsylvania Supreme Court affirmed, holding that *Hope Natural Gas* did not require that rates be set at levels sufficient to guarantee the financial integrity of a utility "irrespective of countervailing consumer interests," and that the investor interests are "factors to be weighed in the balancing analysis under *Hope*, but they are not, in themselves, controlling, for other factors must be taken into account." *Pennsylvania Elec. Co.*, 502 A.2d at 132, 134. Jersey Central has been afforded no hearing, unlike Metropolitan Edison, and the Commission in this case has ignored, rather than balanced, the factors that the Pennsylvania court has said ought to be weighed.

**5.** The dissent argues that it is inappropriate to use calculations involving the rate base to address the financial problems suffered by utilities. Dissent at 1203–1204. But we do not hold that the Commission *must* adjust the rate base or that it *must* make any specific form of adjustment, or even any adjustment at all. It is only required to hold the "end result" hearing discussed in *Hope*. After the hearing it *may* be determined that adjustments need to be made to the Jersey Central rate order, but we express no view as to the precise manner in which any such adjustments would have to be made, so long as whatever is done is satisfactory. On a different front, the dissent speculates that the Commission's actions may only affect a minor portion of Jersey Central's business, and that it would be wrong for the Commission to grant full relief for all of the utility's financial problems. Dissent at 1206–07. We of course do not require the Commission to take such broad steps; we only require it to hold the hearing mandated in *Hope* and to consider whether *any* adjustments, even perhaps partial adjustments, should be made in light of the factors discussed in *Hope*.

sion: not in the orders under review, not at the original hearing before a panel of this court, not in its first response to the petition for rehearing, not in its second response, and not in its submission to the *en banc* court. Moreover, the point that the intervenors and the dissent seek to make the pivot of this case was not perceived by the panel in its unanimous first decision or by either the majority or the dissent in the panel's second decision. The point was not the reason we granted rehearing *en banc.* That was done entirely to rehear the *Hope* "end result" issue. The procedural argument was raised only at the *en banc* stage.

But the oddest aspect of this entire history is that the Commission has never said what the intervenors and the dissent say: that Jersey Central could have had a hearing on the *Hope* "end result" test if only it had followed some other procedure. The fact that the Commission never relied on this argument might be reason enough to reject it. And, in any event, because the Commission did rule that Jersey Central's proffer was inadequate, and thus committed legal error under *Hope,* it is not strictly necessary that we discuss the procedural point. The merits were reached and the claims were wrongly dispatched without any provision of the "end result" hearing required by *Hope.* Nonetheless, even though it makes no difference to the ultimate resolution of this case, we think it well to show this procedural contention is wrong. The intervenors' characterization of the utility's filing and its interpretation of the available Commission procedures do not withstand analysis.

### A.

█ The intervenors and the dissent assert that in requesting rate-base treatment for the unamortized portion of the costs of the cancelled plant, Jersey Central violated the "rule" established by the Commission in *NEPCO.* There was, however, no suggestion in that case that the Commission was establishing any ironclad rule. The subject of that proceeding was the proper treatment of a cancelled generating unit at NEPCO's Salem Harbor facility. The Commission was faced with a number of issues, such as the length of the amortization period and the percentage of costs the utility would be permitted to amortize. It was also faced with the question of whether the unamortized portion of those costs should be included in the rate base. The Commission resolved that question by simply quoting from, and indicating its agreement with, the findings of the Administrative Law Judge, who had concluded that "[t]here is no precedent, *or reasonable justification in the record of this proceeding,* to require ratepayers to pay a return on an expenditure that has not resulted in productive plant that is used or useful in the public service." *NEPCO,* 8 F.E.R.C. (CCH) at 61,175 (emphasis added). The Commission had decided that application of the used and useful principle in that case, on the basis of the facts presented, would yield a reasonable balancing of the competing interests. It was not, as the intervenors suggest and the dissent states, establishing a rigid rule.

When NEPCO challenged the Commission's decision before this court, it was unsuccessful. *NEPCO Municipal Rate Comm. v. FERC,* 668 F.2d 1327 (D.C.Cir. 1981), *cert. denied sub nom. New England Power Co. v. FERC,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). NEPCO argued that *any* application of the used and useful principle that led to the denial of a return on prudently-invested capital was unconstitutionally confiscatory. We rejected that argument, and accepted that advanced by the Commission in its brief: "*In The Circumstances Of This Case,* The Commission Correctly Allowed The Utility To Recover Costs (But No Profit) For Cancelled Facilities," Brief for Respondent FERC at 18 (Argument Subheading I.B. 2) (emphasis added). We did not hold that the balance struck in *NEPCO* would be upheld in any future proceeding to which it was applied, regardless of the facts involved. Instead, we simply declined to hold, as urged by the utility, that failure to allow a return on prudently-invested capital was *per se* unconstitutional, and we affirmed

the Commission's decision to employ the "used and useful" principle, finding that NEPCO had "set forth no compelling reason for departing from that approach *in this case.*" *NEPCO,* 668 F.2d at 1335 (emphasis added).

In at least four subsequent proceedings, the Commission relied on *NEPCO* in summarily excluding the unamortized costs of cancelled plants from the rate base. While the intervenors overstate the matter by referring to the *NEPCO* precedent as a rule, it is fair to say that application of the precedent to routine cases like those was becoming a practice. Jersey Central's filing, however, was anything but routine. It presented allegations suggesting material differences between its situation and those presented in the *NEPCO* line of cases. First, the amount of the loss was on an entirely different scale. The Commission had never applied *NEPCO* to a loss at the order of magnitude of nearly $400 million. (*Ohio Edison Co.,* 18 F.E.R.C. (CCH) ¶ 61,010 (Jan. 8, 1982), for example, involved a loss of $773,146.) Second, in none of the previous cases had the petitioner suggested that it was facing financial distress of the sort threatening Jersey Central. Third, Jersey Central's filing proposed an amortization period three times longer than that established in *NEPCO*. A longer amortization period strikes a balance more favorable to ratepayers, and Jersey Central was apparently willing to accept lower revenues in exchange for the higher recorded earnings which would have accompanied rate-base treatment of the cancelled plant, since it needed to record earnings in order to regain its access to the capital markets.

These factual differences distinguishing *NEPCO* from the case before us are substantial. In *Michigan Wisconsin Pipe Line Co. v. FPC,* 520 F.2d 84 (D.C.Cir. 1975), we explained that "the Commission may attach precedential, and even controlling weight to principles developed in one proceeding and then apply them under appropriate circumstances in a stare decisis manner." *Id.* at 89. In that case, however, the Commission's decision to attach

such weight to a prior proceeding was remanded, because

> a rudimentary prerequisite to such an application is that the factual composition of the case to which the principle is being applied bear something more than a modicum of similarity to the case from which the principle derives. This is not to say that factual patterns must be virtually identical for a principle to control, but rather that there is a point where the patterns are so diverse that a per se application of the principle, without at least recognition and accommodation of the factual distinctions, brings into question the rationality of the application.

*Id.* Given the importance of a utility's financial condition to the balancing required of the Commission, and Jersey Central's willingness to accept smaller revenues in order to record higher earnings so as to maintain that integrity, Jersey Central must have thought, as we do, that it had presented allegations that required reasoned examination, not summary dismissal in reliance on a precedent dealing with vastly different facts.

*Trailblazer Pipeline Co.,* 18 F.E.R.C. (CCH) ¶ 61,244 (Mar. 12, 1982), presented Jersey Central with some additional grounds for believing that the Commission would take a more flexible approach. While the procedural posture was different—this was not a rate filing, but a proceeding brought to obtain Commission certification to construct and operate a gas pipeline—the Commission discussed in its opinion what rate treatment would be accorded gas projects in the event of abandonment. When prudent, conventionally-financed projects were cancelled, the Commission indicated that the company would be able to recover debt service and a return of, but not on, the equity portion of the investment. *Id.* at 61,502–03. The Commission explained in a footnote:

> The rationale is that while companies should be able to recover the amount of their investment in failed projects, they should not be allowed to profit from their failures. Correlatively, loss of the time

value of their equity in failed projects represents a reasonable sharing with ratepayers of the losses of a failed project. *Id.* at 61,511 n. 17. The application of these principles to electric utilities was suggested by the Commission's statement that "[t]here is no obvious reason why the treatment of abandoned plant costs as between gas and electric companies should differ." *Id.* at 61,511 n. 15. And though this statement was made in a context where electric companies are treated more generously than gas companies, *see id.* at 61,511 & n. 15, the clear implication was that treatment of the two should in every sense be the same. Given *Trailblazer's* holding that gas companies would be able to recover debt service and a return of, but not on, the equity portion of the investment, *id.* at 61,502–03, this statement strongly suggests that the Commission would also consider extending the same treatment to electric companies.[6]

The proposed pipeline in *Trailblazer* was financed through project financing. The discussion of conventionally-financed projects was not, however, *dicta.* The Commission was presenting Trailblazer Co. with a choice between conventional and project financing, and explaining the consequences of each alternative. The Commission was offering to be bound by the rule it laid down for conventional financing if Trailblazer elected to proceed in that fashion. *Trailblazer's* discussion of "Commission policy with respect to abandoned plant," 18

F.E.R.C. (CCH) at 61,501, plausibly led Jersey Central to believe that what the intervenors and the dissent characterize as a well-established rule in fact was open to further evolution. Indeed, the Commission's discussion of the question (published two weeks before Jersey Central made its filing) was prompted by its recognition that "Commission treatment of the issue of abandoned plant in rate proceedings has been uncertain. In fact, it has been characterized by a somewhat distressing degree of inconsistency. That inconsistency is important because it tends to leave both lenders and equity investors with a sense of uncertainty...." *Id.*[7]

The intervenors' and the dissent's characterization of Jersey Central's filing as an intentional deviation from the Commission's "rules" is an unreasonable one. There was no reason for the company to adopt a suicidal course and it is wrong to impute an intent for which there is no evidence. This characterization is particularly unfair since, under that analysis, one must read into the filing an implied waiver of statutory and constitutional rights. Jersey Central was not mounting a frontal assault on a firm rule. To the contrary, it argued throughout the proceedings below that the cases in which the practice had developed were not similar enough to what was now at issue to warrant their application as dispositive precedent, and that recently articulated Commission policy and the threat in Jersey Central's situation to the investor interests that the Supreme

---

**6.** In our discussion of *Trailblazer* in *Jersey Central I,* 730 F.2d at 820, we stated that "the treatment accorded the pipelines, if applied here, would not permit Jersey Central to recover its equity investment, the debt, the carrying charges on the debt, and the preferred stock costs." We were in error. While project-financed pipelines were to waive their right to recover the equity investments, the Commission expressly distinguished conventionally-financed pipelines in its discussion on the ground that conventionally-financed pipelines involve a higher risk of shareholder exposure to loss, thus suggesting that the latter will not be required to waive their right to recover the equity investments. 18 F.E.R.C. (CCH) at 61,503–04. And recovery of the remaining costs would be allowed on the theory that the loss of a return *on*

(not *of*) common equity would constitute the company's share of the burden imposed by the cancellation.

**7.** This lingering uncertainty about what the intervenors and the dissent so confidently label a "rule" is indicated also by the fact that the Commission's policy, which as we have shown has never been clear or settled, is still in a state of flux. The Commission has now initiated a rulemaking proceeding in order to consider the establishment, for the first time, of a genuine rule with respect to the treatment of cancelled plants. *See* 31 F.E.R.C. (CCH) ¶ 61,376 (June 28, 1985); Regulation of Electricity Sales-for-Resale and Transmission Service, 50 Fed.Reg. 27,-604, 27,612–14 (1985).

Court had deemed protected required some consideration more detailed than that given by summary dismissal.[8]

### B.

Essential to the intervenors' and the dissent's analysis is the assertion that Jersey Central had other means of getting the hearing it sought. It is only by positing alternative filings through which Jersey Central would have received a hearing on financial integrity that the intervenors and the dissent are able to place the responsibility for what occurred on the utility. Quite clearly, the Commission may not maintain a system of rules that provides no opportunity at all for *Hope* allegations to be raised, heard, considered, and made the subject of findings. Yet that opportunity is precisely what the Commission tells us it routinely denies. For this reason, too, the intervenors' and the dissent's argument fails.

As noted earlier, *supra* p. 1179, the Commission in its brief will say only that it *"may* also look to the criteria of *Hope* in determining whether its rate order is just and reasonable." There is in that no promise of a *Hope* hearing under any circumstances; only a declaration that one is not required.

The following exchange from the *en banc* oral argument further illuminates the Commission's belief that it owes no one a hearing on *Hope* issues:

COURT: Suppose everything else in this case were the same, you would apply the NEPCO rule, et cetera, but the utility came in with even stronger showing and they came in and showed that if this rate went into effect, by God, they would be the first utility in the history of American utilities to go into actual bankruptcy or—

COUNSEL: I think there is no—

COURT: Let me finish the question.

COUNSEL: All right.

COURT: If that kind of showing were made, do you think that the Commission under Hope Natural Gas had a responsibility to, despite the fact that it applied some general rules, to look at the situation and say, gee, the end results are pretty scary and maybe we had better do some fooling around with—

COUNSEL: I think the answer is yes, Your Honor, and it reminds us of the—

COURT: Well, my second question then is do you, and, if so, how? In most cases that are close, a little closer than that, do you do anything comparable at the end of the day after you have applied the NEPCO and other rules, to look back over your shoulder and say this is the situation, we ought to do some tinkering around and, if so, *do you make any such findings?*

COUNSEL: The answer to the question is yes, we do tinker around after we pursue these normal ratemaking policies. And the tinkering around or making those pragmatic adjustments, the nice adjustments is the way the Commission has in the past viewed its responsibility under the end result test—

COURT: *Do we ever know, do we—*

COUNSEL: *No, you don't. As long—*

COURT: *We don't know whether you did that or not?*

COUNSEL: *It essentially turns on the rate of return, the tinkering with the rate of return.*

Tr. at 28–30 (emphasis added). The Commission's apparent practice of taking these issues into account by "tinkering" and without making open, factual findings follows quite naturally from its mistaken premise that meaningful judicial review of these decisions is never, or almost never, in order. For us to hold now that Jersey

---

**8.** As the dissent notes, it is clear that Jersey Central did not structure its filing to conform to *Trailblazer.* Dissent at 1201. Yet it did rely heavily on *Trailblazer* in its argument for rehearing before the Commission, as well as in its arguments before the first panel, second panel, and *en banc* panel of this court. *See, e.g.,* Initial Brief of Jersey Central *passim.* In any event, the more important point is simply that *Trailblazer* offers further evidence of the uncertainty that surrounds this issue and belies any characterization of the Commission's practice as a rigid rule.

Central could have had its *Hope* claim considered had it made a different filing would be to rest upon a theory that the Commission has never put forward, indeed, a theory the Commission apparently has rejected.

The only constant in these proceedings has been the Commission's manifest hostility to serious "end result" examination under *Hope.* That alone can account for the Commission's peremptory ruling on the merits. That hostility, and not the Commission's desire, made clear only in this proceeding, to elevate its used-and-useful principle to the status of an impregnable barrier, appears to underlie the Commission's abrupt and uninformative procedural rulings. At the time of Jersey Central's filing, counsel could well have concluded that used-and-useful was a rule of thumb that would be modified when circumstances warranted. But if the Commission wished to eliminate its previous circumstance-bound enunciation of the rule and to make it universal and unyielding, it should have allowed Jersey Central to get to the merits of its *Hope* "end result" claim in some other way. Instead, it met each of Jersey Central's renewed efforts with a fresh procedural rebuff and never once gave the slightest indication of how Jersey Central could get the hearing it sought.

The intervenors and the dissent suggest that Jersey Central could have requested a shorter amortization period, perhaps the period allowed in *NEPCO,* and received higher rates through that method. That technique would have been of little help, however, for while it would have led to quicker, higher *revenues,* Jersey Central needed to record *earnings* in order to lay a foundation for the issuance of securities and regain access to the capital markets. That could not be done through faster recovery of costs.

The intervenors and the dissent also state that Jersey Central could have requested a higher rate of return, and, had it done so, would have received the *Hope* hearing it wanted. Given the excerpt we have quoted from oral argument, it is impossible to know why they believe that to be true. Nothing the Commission has said provides any such assurance. To the contrary, when Jersey Central suggested a higher rate of return in its petition for rehearing, the Commission dismissed the request as presenting a "moving target." That maneuver was particularly pointless since it would merely have required the company to come back with a new filing requesting the same higher rate of return based upon the same data. The Commission thus saved no effort of its own but cost the company the higher return in the interval. (Of course, in the same order the Commission made it clear that a fresh filing would be futile.) The Commission could have entertained the company's request for a higher rate of return. Given the very unusual circumstances here, which may have amounted to a denial of constitutional rights, that course would not have jeopardized deployment of the "moving target" doctrine in the ordinary case.

The Commission has yet to articulate anything approaching a coherent conception of what *Hope* requires, when hearings and findings are necessary, which facts are relevant, or how judicial review of rate orders should proceed. It is clear that the Commission would not have granted Jersey Central a *Hope* hearing if the company had somehow anticipated and followed every one of the dissent's freshly-invented prescriptions. The Commission below and its counsel here have said as much. It is, therefore, preposterous to contend that the Commission's multiple failures with respect to the "end result" test were caused, and hence excused, by Jersey Central's alleged procedural intransigence.

## IV.

The Commission is not precluded from employing "used and useful," or any other specific rate-setting formula. It must ensure, however, that the resulting rate is just and reasonable. A remand will afford the Commission the opportunity to find the facts necessary to a determination of whether the rate order meets the requirements *of Hope Natural Gas,* and, if it

finds that it does not, the Commission has the flexibility to determine how the rate order should be modified—whether through enlarging the rate base, increasing the rate of return, or a combination of both. That will fulfill its obligations under the law.

*So Ordered.*

STARR, Circuit Judge, concurring:

Although I agree with my dissenting colleagues that Jersey Central has mounted an ill-conceived and overly broad attack on the "used and useful" principle, *see* Dissenting Opinion at 1197, I am satisfied that under the circumstances presented this case must be returned to the Commission. For the reasons that follow, I concur in the opinion of the court and in the decision to vacate and remand the Commission's orders.

I

The Commission has acted cavalierly in this case. As the court's opinion persuasively demonstrates, the Commission failed to take seriously the allegations of severe financial plight confronting Jersey Central. Its discussion of that plight is intolerably terse. In its order on reconsideration, the Commission stated that no testimony or exhibits had been proffered to justify a higher return. Yet the allegations of financial plight were highly detailed and specific, indicating that the utility was skating on the edge of bankruptcy.

The Commission's stated justification for summarily dismissing these allegations was the weight of its prior "used and useful" precedent. But as the court's opinion shows, that body of precedent did not constitute as ironclad a rule as the Commission would have us believe. It is certainly not evident from those precedents that the rule could be summarily applied in the face of the financial demise of the regulated entity.

Indeed, the Commission as a matter of policy has departed over the years from the strictures of the "used and useful" rule.

This is illustrated by its treatment of "construction work in progress" (CWIP), part of which, the Commission recently determined, can be included in a utility's rate base. *See Mid-Tex Electric Corporation v. FERC*, 773 F.2d 327 (D.C.Cir.1985). In that proceeding, the Commission recognized that its own practice admits of "widely recognized exceptions and departures" from the "used and useful" rule, "particularly when there are countervailing public interest considerations." *See* 48 Fed.Reg. 24,323, 24,335 (June 1, 1983) (CWIP final rule). In that setting, financial difficulties in the electric utility industry played a significant role in the Commission's decision to bend the rule. *See id.* at 24,332; 773 F.2d at 332–34. *See also, e.g., Tennessee Gas Pipeline Co. v. FERC*, 606 F.2d 1094, 1109–10 (D.C.Cir.1979) (departure from "used and useful" to permit rate base treatment of natural gas prepayment is justified as means of encouraging development of additional gas reserves), *cert. denied*, 445 U.S. 920, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980).

This policy of flexibility, it seems to me, reflects the practical reality of the electric utility industry, namely that investments in plant and equipment are enormously costly. Rigid adherence to "used and useful" doctrines would doubtless imperil the viability of some utilities; thus, while not articulating its results in *Hope* or "takings" terms, the Commission—whether as a matter of policy or perceived constitutional obligation—has in the past taken these realities into account and provided relief for utilities in various forms.

What the Commission now confronts in Jersey Central's rate filing is an investment, prudent when made, in a nuclear power facility that was doomed to failure. The cost of that project prior to abandonment was enormous—$397 million. Under these circumstances, the Commission, in order to engage in reasoned decisionmaking, has a duty to consider the entire financial circumstances confronting the utility, as it did in the CWIP context, not to rely blindly on precedents which do not involve similarly situated utilities facing the most dire

financial consequences. Should the Commission nonetheless choose to adhere to the "used and useful" principle in these circumstances, it must provide a reasoned explanation for that decision. "Judicial review of the Commission's order [ ] will ... function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its order [ ] for the character and future development of the industry." *Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968). It is scarcely reasoned decisionmaking to dismiss out of hand allegations that go to the heart of the utility's financial viability.

## II

The Commission's arbitrary and capricious treatment of the issues presented by Jersey Central necessitates the return of this case for further proceedings. The specific questions on remand will be whether the Commission's treatment of Jersey Central's request is consistent with prior precedent and whether the rate order entered in this instance violates *Hope*'s "end result" test. To address the latter question, it will be necessary to take into account the constitutional considerations at stake, namely whether the rate order or any other agency action which preceded that order worked a "taking" within the compass of the Fifth Amendment's Takings Clause. Those would appear to be novel issues for a Commission that seems determined to avoid an "end result" inquiry as such, while at the same time making various adjustments to bring relief to troubled parts of the electric utility industry. Under these circumstances, a comment or two is in order as to why I have concluded that, notwithstanding the Commission's agnosticism, Jersey Central's complaint "sounds" in the constitutional demands of the Fifth Amendment. Whether the facts would indeed make out a constitutional violation is obviously not before us, Majority Opinion at 1174, and must await the *Hope*-mandated hearing which must now be held.

The utility business represents a compact of sorts; a monopoly on service in a particular geographical area (coupled with state-conferred rights of eminent domain or condemnation) is granted to the utility in exchange for a regime of intensive regulation, including price regulation, quite alien to the free market. *Cf. Permian Basin*, 390 U.S. at 756–57, 88 S.Ct. at 1354–55 (unlike public utilities, producers of natural gas "enjoy no franchises or guaranteed areas of service" and are "intensely competitive"). Each party to the compact gets something in the bargain. As a general rule, utility investors are provided a level of stability in earnings and value less likely to be attained in the unregulated or moderately regulated sector; in turn, ratepayers are afforded universal, non-discriminatory service and protection from monopolistic profits through political control over an economic enterprise. Whether this regime is wise or not is, needless to say, not before us. *See generally* Posner, *Natural Monopoly and Its Regulation*, 21 Stan.L.Rev. 548 (1969); Demsetz, *Why Regulate Utilities?*, 11 J. Law & Econ. 55 (1969).

In the setting of rate regulation, when does a taking from the investors occur? It seems to me that it occurs only when a regulated rate is confiscatory, which is a short-hand way of saying that an unreasonable balance has been struck in the regulation process so as unreasonably to favor ratepayer interests at the substantial expense of investor interests. Thus, in my view, a taking does not occur when financial resources are committed to the enterprise. That is especially so since a utility's capital investment is made not simply in satisfaction of legal obligations to provide service to the public but in anticipation of profits on the investment. The utility is not a servant to the state; it is a for-profit enterprise which incurs legal obligations in exchange for state-conferred benefits. A profit-seeking capital investment is scarcely the sort of deprivation of possession, use, enjoyment, and ownership of property which can conceptually be deemed a taking. *See generally* R. Epstein, *Takings* 63–92

(1985). Indeed, it would seem odd to consider as a taking government's disavowal of any interest in property which remains unregulated and which reflects a profit-seeking investment.

It is also of significance to the constitutional inquiry whether the regulators forbade completion of construction. *Cf. In re Public Service Co.*, 122 N.H. 1062, 454 A.2d 435 (1982) (holding that under the New Hampshire constitution, the State cannot prevent completion of construction of the Seabrook nuclear power facility without providing just compensation). *But see Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (New York City historic preservation law employed to forbid development of office building). It would seem that, at least conceptually, a taking of investment funds in the Forked River project would have occurred if government so regulated as to prevent the property, in whole or in part, from being employed in the manner desired by the owner. But as we know, these conditions did not occur.

Nor would a taking (*pro tanto*) automatically occur when regulation itself takes place, for that was part of the original compact between investors and the state. Rate regulaton is, in theory, the substitute for competition. The state stands in the shoes, as it were, of competitors, keeping the utility within bounds that would be drawn by market forces in a non-monopolistic market. Whether economically sound or not, utility rate regulation in itself raises no constitutional concerns.

Under one line of analysis, inclusion of prudent investments in the rate base is not in and of itself exploitative. *See Washington Gas Light Co. v. Baker*, 188 F.2d 11 (D.C.Cir.1950), *cert. denied*, 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951). I am not so sure that such an easy rule can automatically be properly employed consistent with the demands of the Fifth Amendment.

Prudence is, of course, relevant to the process of striking a reasonable balance in rate-setting for public utilities. Requiring an investment to be prudent when made is one safeguard imposed by regulatory authorities upon the regulated business for benefit of ratepayers. As I see it, the "used and useful" rule is but another such safeguard. The prudence rule looks to the time of investment, whereas the "used and useful" rule looks toward a later time. The two principles are designed to assure that the ratepayers, whose property might otherwise of course be "taken" by regulatory authorities, will not necessarily be saddled with the results of management's defalcations or mistakes, or as a matter of simple justice, be required to pay for that which provides the ratepayers with no discernible benefit.[1]

The two principles thus provide assurances that ill-guided management or management that simply proves in hindsight to have been wrong will not automatically be bailed out from conditions which government did not force upon it. That is, government forced upon the utility an obligation to provide service, but that obligation, as we have seen, is the *quid pro quo* for a protected area of service (and eminent domain authority). What is fundamental is that government did not force upon the utility a specific course of action for achieving the mandated goal.

Indeed, it would be curious if the Constitution protected utility investors entirely from business dangers experienced daily in the free market, the danger that managers will prove to have been overly sanguine about business prospects or the danger that a particular capital investment will not prove successful. In the face of anticipated demand, an airline may acquire additional aircraft, only to face unhappy consequences when passenger traffic does not meet expectations, perhaps due to economic

---

1. The obvious danger in not examining both ends of the continuum—both the prudence of the investment and whether the end result of the investment was used and useful—is to build in pressures for building excess generating ca-

pacity. The "used and useful" rule operates as a restraining principle, reminding utility managers that they must assume the risk of economic forces working against an investment which is prudent at the time it is made.

factors entirely beyond management's control. Utilities are not exempt from comparable forces.[2] As the cases have repeatedly held, the Fifth Amendment does not provide utility investors with a haven from the operation of market forces. *See, e.g., FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942) ("[R]egulation does not insure that the business shall produce net revenues."). Yet, the prudent investment rule, in full vigor, would accomplish virtually that state of insulation, all in the guise of preventing government from effecting a taking without just compensation.

For me, the prudent investment rule is, taken alone, too weighted for constitutional analysis in favor of the utility. It lacks balance. But so too, the "used and useful" rule, taken alone, is skewed heavily in favor of ratepayers.[3] It also lacks balance. In the modern setting, neither regime, mechanically applied with full rigor, will likely achieve justice among the competing interests of investor and ratepayers so as to avoid confiscation of the utility's property or a taking of the property of ratepayers through unjustifiably exorbitant rates. Each approach, however, provides important insights about the ultimate object of the regulatory process, which is to achieve a just result in rate regulation. And that is the mission commanded by the Fifth Amendment. Unlike garden-variety takings, the requirements of the Takings Clause are satisfied in the rate regulatory setting when justice is done, that is to say the striking of a reasonable balance between competing interests.

Thus it is that a taking occurs not when an investment is made (even one under legal obligation), but when the balance between investor and ratepayer interests—the very function of utility regulation—is struck unjustly. Although the agency has broad latitude in striking the balance, the Constitution nonetheless requires that the end result reflect a reasonable balancing of the interests of investors and ratepayers. As we have seen, both investors and ratepayers were the intended beneficiaries of the Forked River investment; both should presumptively have to share in the loss.[4] Filling in the gaps, the making of the specific judgments that constitutes the difficult part of this enterprise, belongs in the first instance to the politically accountable branches, specifically to the experts in the agency, not to generalist judges.

It is here that *Hope's* "end result" test comes into play. The judiciary is not to micromanage the rate regulation process, just as we are to be restrained in reviewing the other work of administrative agencies. We are not to impose procedures that we think are wise or methodologies that we think strike a better balance than that

---

**2.** The comparison is, of course, imperfect since the airline will enjoy the full fruits of financial success if its acquisition program succeeds. A utility's rate of return, in contrast, is limited by regulation. On the other hand, the airline is not provided with the protection of a regulatory body's interest in preserving the financial soundness of the enterprise.

**3.** I recognize that venerable authority supports firm adherence to "used and useful" precepts. In *Denver Union Stock Yard Co. v. United States,* 304 U.S. 470, 58 S.Ct. 990, 82 L.Ed. 1469 (1938), for example, the Supreme Court (in an opinion joined by Justice Brandeis, the leading proponent of the prudent investment approach) embraced the "used and useful" rule in the following language:

> The rate base. As of right safeguarded by the due process clause of the Fifth Amendment, appellant is entitled to rates, not *per se* excessive and extortionate, sufficient to yield a reasonable rate of return upon the value of property used, at the time it is being used, to render the services. *But it is not entitled to have included any property not used and useful for that purpose.*

*Id.* at 475, 58 S.Ct. at 994 (citations omitted) (emphasis added). But it seems to me that this language was not meant to state an absolute and unchanging constitutional rule regardless of the nature of the investment and the impact of the rate order. The Court's subsequent teaching in *Hope* makes it clear that no specific methodology is either inherently infirm or sacrosanct.

**4.** In like manner, a regulatory order requiring ratepayers to pay monopolistic prices would fail to achieve the constitutionally required balance of interests. That sort of order would work a taking of ratepayers' property, assuming public purpose requirement of the Takings Clause had been met.

struck by the regulators. Our limited but vital role is to ensure that the end result of a rate order reasonably balances investor and ratepayer interests.

We are, fortunately, not left completely in a web of subjectivity in making these judgments. To be sure, Takings Clause law has not been marked by analytical consistency, as Professor Epstein has brilliantly demonstrated in his recent book. Nor has it been characterized, as much as we might care for them, by bright-line rules. In the words of then-Justice Rehnquist speaking for the Court in *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979), the inquiry is "essentially ... ad hoc [and] factual" in nature. Nonetheless, we have been taught that several factors are worthy of consideration in determining whether regulation works a taking, including "the economic impact of the regulation, the extent to which it interferes with investment-backed expectations, and the character of the governmental action." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432, 102 S.Ct. 3164, 3174, 73 L.Ed.2d 868 (1982); *see also PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *Kaiser Aetna*, 444 U.S. at 175, 100 S.Ct. at 390.

While it is premature to pass ultimate judgment on the question, some preliminary observations are in order. The first of the three considerations enumerated in Supreme Court decisions points powerfully in favor of Jersey Central. Forked River represents an enormous loss, and the very enormity of it must weigh heavily in the balance. No one maintains that exclusion of the abandoned plant from the rate base is *de minimis*, not affecting the return on property. *Cf. Loretto*, 458 U.S. at 445, 102 S.Ct. at 3181. (Blackmun, J., dissenting);

*PruneYard*, 447 U.S. at 83, 100 S.Ct. at 2041. To the contrary, Jersey Central represents that it is perilously close to the edge of bankruptcy, unable to secure long-term credit, and unable to attract capital to the enterprise.

The second consideration—the extent to which the agency's action interferes with investment-backed expectations—is mixed. As a general rule, it would appear that investors purchase utility stocks as a mechanism for conservative, safe investments. Drobak, *From Turnpike to Nuclear Power: The Constitutional Limit on Utility Rate Regulation*, 65 B.U.L.Rev. 65, 106–107 (1985). Potentially high rewards are foresworn in favor of stability and safety. And now the situation of Jersey Central's investors is grim. There is no prospect, we are told, for those investors to earn a return on their investment. Thus, in holding over strenuous dissents that no taking was occasioned by New York City's interference with Penn Central's plans to erect an office building atop Grand Central Station, the Supreme Court emphasized that the property owner could still earn a reasonable return on the investment notwithstanding the restrictive effects of the historic preservation law.[5] Jersey Central's investors have nothing but bleak days ahead, we are told, unless regulatory relief is forthcoming.[6]

On the other hand, FERC has already moved somewhat in the direction of balancing competing interests by permitting recovery of the costs of building the plant in the cost of service. Investor interests have not, therefore, been entirely ignored. In addition, as I indicated above, utilities are not shielded by the Constitution from the forces of competition and the uncertainties of economic life, and investors purchasing common stock are after all engaged in

---

5. Needless to say, this analysis does not respond to the objection that a *partial* taking, as opposed to a complete deprivation of property, was being effected.

6. It also goes without saying that Jersey Central's rate woes cannot in any event be laid entirely at the feet of FERC. It appears that

state regulatory authorities, whose orders have considerably greater economic effect on Jersey Central than federal directives, have been inhospitable to efforts to include the Forked River plant in the state-regulated rate base. If that is so, relief from Draconian regulation in Trenton cannot come from Washington, D.C.

economic risk-taking. In addition, it surely cannot be reasonable for an investor to assume that each and every expenditure by a utility will be allowed by regulatory authorities. The very existence of regulation carries with it the hard fact that not every rate increase will be granted, not every expenditure will be allowed. Yet, "reasoned consideration" of investor interests requires more than the mechanical application of everyday rules to the loss of a $397 million investment in a power plant. *Permian Basin*, 390 U.S. at 792, 88 S.Ct. at 1373.

Finally, the character of the government action weighs for takings analysis in favor of the agency. The classic taking is when government invades and possesses property, partly or entirely. Permanent physical occupation provides the clearest example. *United States v. Lynah*, 188 U.S. 445, 468–70, 23 S.Ct. 349, 356–57, 47 L.Ed. 539 (1903). Occupation can, of course, be partial, and the taking can be the consequence of a private invasion if accomplished under the state's auspices. *Loretto*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). A taking can occur when government imposes a right of access on private property, at least when the landowner had reasonably relied on government consent in making the improvements that purportedly opened the property to uninvited outsiders. *Kaiser Aetna*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). The latter case teaches that the elimination of a basic incident of ownership—the right to exclude unwanted visitors from property—can constitute a taking. And, while the issue was sharply disputed in the Court and the resolution seemingly in conflict with *Kaiser Aetna*, it appears from the *PruneYard* case that the conduct of the landowner is of relevance in the constitutional analysis. That case

teaches that willfully surrendering one of the "bundle" of property rights may result in greater, state-protected intrusion by outsiders than the property owner intended. Specifically, a shopping center owner may find that individuals may be permitted, over his objection, to exercise certain noncommercial rights on the shopping center property.[7] *PruneYard*, 447 U.S. at 83, 100 S.Ct. at 2041. Thus, in contrast to *Kaiser Aetna*, the owner of the PruneYard Shopping Center found that he had lost the right to exclude some visitors by issuing an invitation to the public generally to visit the center for commercial purposes.[8]

The nature of the government action in this case obviously seems unintrusive in contrast to more typical takings cases. There has been no invasion, temporary or permanent. As I have previously indicated, the regulatory entity has not forbidden the Forked River project to proceed. What government has done is to forbid the investment to garner a return, thus balancing competing principles of utility regulation. Forbidding a profit on an investment gone sour strikes me, conceptually, as recreating in part the marketplace environment; indeed, FERC's permitting recovery of the investment itself through cost of service works an interference with what would otherwise occur in the unregulated setting, since the investors as risk takers would obviously bear the entire risk that the investment would not pan out. In addition, FERC's obligation to consider consumer needs and expectations must be evaluated in determining whether its order arbitrarily limited the return to investors. *Permian Basin*, 390 U.S. at 769, 88 S.Ct. at 1361 ("[I]nvestors' interests provide only one of the variables in the constitutional calculus of reasonableness.").

7. Like *Penn Central*, this analysis does not squarely address the argument that a *pro tanto* taking has occurred, which, as *Kaiser Aetna* taught, demands compensation under the Takings Clause.

8. Whatever its analytical strengths, the *PruneYard* opinion took pains to emphasize the limited nature of the intrusion by the petition-seek-

ers. Surely the commercial invitation of the PruneYard center's owner would not permit a political candidate to set up campaign operations in the mall's common areas, or for the mall to serve as a makeshift lecture hall on foreign policy or a practice field for the local marching band on rainy days.

But it is not for us to finally resolve these questions in the first instance. That job, as I have said, belongs to regulators, not judges. *See Permian Basin*, 390 U.S. at 792, 88 S.Ct. at 1373. In my view, this case must now be resolved by the Commission, facing up to the hard question of whether, under all the circumstances, a violation of *Hope* has been worked by this rate order. That determination, it seems to me, can only be made by a careful balancing of the competing considerations that are inevitably present in the setting of utility regulation. *Id.* While I am unable to pass judgment on the ultimate issue in this case, I am convinced that FERC has completely failed to come to grips with the question and that the question is now squarely before it for resolution.

MIKVA, Circuit Judge, with whom Chief Judge WALD, and Circuit Judges SPOTTS-WOOD W. ROBINSON, III and HARRY T. EDWARDS join, dissenting:

After two prior opinions, confounded by the Commission's ever-shifting position, it is small wonder that this court is having difficulty seeing the forest for the trees. In its attempt to beat a clear path to resolution of the issues, however, the majority treads with heavy foot over some well-held doctrines regarding takings, unreasonableness of return, and the obligation of the Federal Energy Regulatory Commission (the Commission or FERC) to guarantee the financial solvency of a utility. Perhaps the greatest damage is rendered by the implications of the majority opinion for the scope of judicial review of Commission ratemaking procedures. Although we believe the Commission has been less than forthright in defending its action, we cannot join in the havoc our colleagues have wreaked in order to slap its hands.

The ramifications of today's decision are inescapably broad. Whenever a utility files a proposed rate schedule and alleges that the revenues and earnings contemplated produce the "minimum amount" necessary for it to have access to capital markets and to maintain its financial integrity, the Commission is constrained to take no interim rate-reducing action without first holding a hearing and making findings pursuant to the test formulated in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The majority reads *Hope* as authorizing the court to direct FERC, when faced with such allegations, to abandon its otherwise permissible summary disposition procedures. This holding constitutes a blatant interference with the ratemaking procedures adopted by the Commission. Such intrusion into the Commission's authority would have been deemed outrageous even in the days before *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). We cannot believe that it is unobjectionable in this age of judicial deference. Therefore, we respectfully dissent.

## I. BACKGROUND

A full appreciation of the impact of today's decision requires an understanding of the posture in which this case comes to us. At an intermediate stage of the rate-making proceeding, the Commission summarily rejected a non-conforming portion of Jersey Central's filing pursuant to longstanding policy and procedure. Jersey Central loudly complained and refused to go further with the ratemaking process. In rushing headlong into the *Hope* issue, the majority loses sight of what we have here—Jersey Central is attempting to convert its rate case into a rulemaking proceeding. The majority allows the utility to succeed. It responds to Jersey Central's complaints by directing FERC to abandon agency rules as applied to the utility and to implement the utility's rates according to procedures the Commission would not normally follow.

On March 31, 1982, Jersey Central Power and Light Company (Jersey Central) filed a proposed two-phase increase in its rate schedules for six wholesale customers. Phase A has gone into effect and is not at issue here. In Phase B, the utility proposed to amortize over 15 years a $397

million investment lost when it abandoned construction of a nuclear power plant project at Forked River, New Jersey. That is, Jersey Central sought to recover the project expenditure from its ratepayers as costs over time. It also sought to include in its rate base the current carrying charges (computed at 5.2%) on the debt and on the preferred stock portions of the unamortized investment in the plant. The total return a public utility captures is, simply put, the product of its permitted rate base and rate of return. Thus, the inclusion of the desired items in the rate base would generate a return on them over the amortization period; current ratepayers would bear the cost. The exclusion of these items from the rate base would require Jersey Central's common equity investors to bear a financial burden; they would not obtain a return on the investment and would pay current charges.

Jersey Central's wholesale customers protested the increased rates tendered for filing and petitioned the Commission to intervene in the ratemaking proceedings. Among other requests, the wholesalers moved for a partial rejection of the second phase of the rate filing. Adhering to its policy regarding abandoned investments, the Commission granted the wholesalers' motion for summary disposition of the rate base inclusion of the unamortized investment in the cancelled plant. Under settled FERC policy, expenditure for an item may be included in a public utility's rate base only when the item is "used and useful" in rendering service to the ratepayers. Accordingly, the Commission's interim order allowed amortization of the Forked River investment as requested, but required Jersey Central to exclude the unamortized items from its rate base. 19 FERC (CCH) ¶ 61,208 (May 28, 1982).

In ordering this exclusion, FERC relied on *New England Power Co.,* 8 FERC (CCH) ¶ 61,054 (July 19, 1979), *aff'd sub nom. NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission,* 668 F.2d 1327 (D.C.Cir.1981), *cert. denied,* 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982) (*"NEPCO"*). NEPCO

held that utilities could amortize the full investment loss suffered from abandoned projects, but could not include the unamortized portion of these investments in the rate base because the abandoned projects were not "used or useful." By following *NEPCO,* the Commission allowed Jersey Central to recover its total investment in the project to the point of cancellation, but denied the utility any return on the capital invested in the cancelled plant.

In concluding, the Commission ordered Jersey Central to file revised Phase B rates and cost support reflecting the summary disposition. The revision ordered would presumably be downward. Notably, because its preliminary review "indicate[d] that [the Phase B increase] may produce substantially excessive revenues," the Commission suspended implementation of Phase B and ordered that a public hearing be held "concerning the justness and reasonableness of [Jersey Central's] rates." 19 FERC (CCH) ¶ 61,208, at 61,404.

Jersey Central did not file the revised material ordered. Instead, on June 24, 1982, it applied for rehearing, requesting reconsideration of the summary disposition or, in the alternative, a higher rate of return than that originally proposed in order to compensate for its diminished rate base. The Commission denied rehearing as to exclusion of the investment in the cancelled nuclear facility from the rate base. It noted that its decisions since *NEPCO* had reaffirmed the exclusion of current charges on unamortized investments. *Jersey Central Power & Light Co.,* 20 FERC (CCH) ¶ 61,083, at 61,181 (July 23, 1982). In rejecting Jersey Central's alternative proposed approach, the Commission ruled that the company could not support its revenue request on rehearing simply "by inflating the rate of return to recover dollars equal to those attributable to its impermissible rate base inclusion." *Id.* at 61,182. Pursuant to settled policy, the Commission refused to consider increasing the rate of return when that alternative was raised in the first instance on application for review without supporting documentation. *See id.*

After the denial of rehearing, Jersey Central again failed to revise its filings. Had it done so, an Administrative Law Judge (ALJ) would have held a hearing, pursuant to the Commission's initial order, on the "justness and reasonableness" of the rates. At this hearing, the wholesalers could have intervened and presented their arguments that the rates, although reduced from those originally proposed, were nonetheless excessive. *See* 19 FERC (CCH) ¶ 61,208, at 61,404. Similarly, Jersey Central could have testified as to its belief that the reduced rates were too low.

Furthermore, the utility had two additional avenues open to it. First, Jersey Central could have refiled for a proposed rate increase after its application for rehearing was denied by operation of law. *See* 18 C.F.R. § 385.714(f) (1986). In pointing out the inadequacies of Jersey Central's initial filing, the Commission clearly left the way open for a *new* rate proceeding that would include testimony and exhibits supporting a higher rate of return, as required by the Commission's rules. *See id.* § 35.13 (1986). In such a request the utility could have proposed a shorter amortization period than that it had initially requested or offered evidence of cost of service elements justifying a higher overall return on the remaining assets in the rate base. Second, Jersey Central could have petitioned the Commission for a rulemaking concerning the continued validity of the "used and useful" principle when applied to cancelled plants generally. *See generally* Administrative Procedure Act, 5 U.S.C. § 553(e) (1982). At the proposed rulemaking proceeding, Jersey Central could have presented testimony in support of its position that the Commission's present used and useful policy unnecessarily penalizes utility investors. *See* 18 C.F.R. § 385.505 (1986). Instead of pursuing either, or both, of these administrative alternatives, Jersey Central appealed to this court.

The majority seems to have lost sight of the juncture at which we stand in reviewing the Commission's orders. It is too anxious to reach the end of the road. The majority contends that the Commission

"reached" and "wrongly dispatched" Jersey Central's *Hope* claim. Majority Opinion (Maj. Op.) at 1183; *see also id.* at 1170. Its reasoning runs as follows: "The Commission ruled that Jersey Central's allegations and proffered testimony would not support a higher rate. That substantive ruling means that a hearing would have been pointless." *Id.* at 1170. Although the Commission's interim order has implications for the utility's *Hope* claim, this construction is unfounded. Furthermore, it makes a mockery of the Commission's order to hold a hearing on the very issue of the justness and reasonableness of the revised rates.

Contrary to the majority's postulation, it is not the Commission's position that it need not make an "end result" examination. *See id.* Throughout its briefings and arguments before this court, the Commission has allowed that it must construct a rate within the confines of the "zone of reasonableness" informed by *Hope.* Rather, the Commission maintains that it need not hold a hearing to make that inquiry before it excludes a non-conforming element from a proposed rate base—at least not on the facts alleged here. The "end result" inquiry is made at the end of the ratemaking process, not at an intermediate, summary disposition stage. Thus, a hearing on inclusion of the unamortized portion of the cancelled plant in the rate base would be "pointless." A hearing on the resultant rates would not be. In fact, as counsel for FERC explained at oral argument, it was the post-appeal settlement adjusting Jersey Central's rate of return that obviated the need for the rate hearing ordered by the Commission.

No one disputes Jersey Central's right to have the end result of the ratemaking proceeding subjected to a *Hope* inquiry. The issue is one of timing. FERC provided for a hearing on the adequacy of the rates allowed Jersey Central *after* the Commission's reduction. The final rate order that emanated from that hearing would in any event be subject to judicial review. *See Hope, supra.* Jersey Central demands a

hearing *before* the reduction—now, not at the end. No wonder the majority and separate opinions complain of not having a record through which to examine the Commission's effort to balance the relevant interests. Maj.Op. at 1172, 1178; Separate Opinion (Sep.Op.) at 1188–89. Jersey Central elected to forego a hearing on the reduced rates and instead chose to clamor to this court for review of the Commission's actions taken before the final balancing was performed. It is an interim rate-reducing order of which Jersey Central seeks review, not a final rate-setting order. The majority's decision to yield to Jersey Central's demands directly implicates the Commission's ratemaking authority and its capacity to exercise its valid, established procedures free of judicial improvements.

The question this court addresses is the question that Jersey Central reserved its right to appeal under the settlement agreement: whether the Commission acted properly in limiting the rate base to used and useful property. As the majority recounts, Maj.Op. at 1173, Jersey Central's challenge to the Commission's orders takes three principal tacks. The utility first claims that the Commission has not established a used and useful rule applicable to its proposed filing. Second, the utility claims that, even if there were such a rule, application of the doctrine under the circumstances would lead to unconstitutionally confiscatory rates; therefore, it contends, the Commission cannot summarily apply the rule and must provide an evidentiary hearing. Finally, Jersey Central complains that, in the alternative, it is entitled to a hearing on an increased rate of return on its initial filing.

The majority finds that there is no iron-clad rule regarding rate base treatment of cancelled electric utility plants and holds that Jersey Central is automatically entitled to a hearing on its proposed filing. Our inquiry leads us to the firm conclusion that the Commission acted reasonably and that Jersey Central is not entitled to a hearing on rate base treatment of the unamortized cost items of its rate schedule or

on an inflated rate of return. The Commission followed established agency rules and procedures and Jersey Central cannot complain. There may be times when FERC is not free to summarily apply settled doctrine during the ratemaking process, but Jersey Central has not presented such a case.

## II. THE COMMISSION'S APPLICATION OF THE USED AND USEFUL RULE

At the heart of Jersey Central's complaint is its dislike of the used and useful principle, especially as elaborated in *NEPCO, supra*. In its attempt to have the Commission reconsider the doctrine, Jersey Central argues that the precedent does not, or should not, apply to it. Unlike the majority, we find that, in *NEPCO* and subsequent cases, the Commission firmly established a valid rule for the calculation of rate base in electric utilities' rate filings. Unmoved by Jersey Central's endeavors to distinguish itself, we conclude that the Commission's summary rejection in this case precisely follows that precedent.

It is, of course, widely accepted that the Commission may develop principles in one proceeding and then attach precedential or even controlling weight to them in later proceedings. *See, e.g., Michigan Wisconsin Pipe Line Co. v. Federal Power Commission*, 520 F.2d 84, 89 (D.C.Cir.1975). And the Commission can properly implement that policy, in order to protect consumers, at the summary judgment stage of its proceedings. *See Municipal Light Boards v. Federal Power Commission*, 450 F.2d 1341 (D.C.Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972). The majority seems to have no quarrel with this premise. Like Jersey Central, however, it disputes that the Commission had developed a principle or rule against including the unamortized portion of an abandoned investment in the rate base. Although not the ground on which it remands the proceeding, the majority implies that the application of the used and useful doctrine to Jersey Central's rate

**1198**

schedule was inconsistent with any practice established by the Commission. *See* Maj.Op. at 1185–86. The majority's reasoning distorts the NEPCO precedent established by the Commission, contradicts this court's interpretation of the doctrine, and manipulates inapposite Commission decisions.

## A. *The NEPCO Approach*

The majority asserts that rather than establishing a general policy in *NEPCO*, the Commission was engaging in a case-specific balancing of interests. *Id.* at 1183. The majority thus conceives the crucial factor underlying *NEPCO* as the reasonable balance that was struck by the Commission's compromise between the NEPCO rate-payers and investors. In its view, the *NEPCO* decision was as much dependent on the length of the amortization period, the percentage of costs the utility would be permitted to amortize, and the size of the investment as it was on the question of whether the unamortized portion of those costs should be included in the rate base. *Id.* Therefore, because Jersey Central proposed a different amortization period, presented a much larger investment and faced financial distress, a fact not alleged in *NEPCO*, the utility had substantially distinguished itself from *NEPCO*. *Id.* at 1184. Under the majority's interpretation, the Commission must strike a new reasonable balance between ratepayers and investors in this case and cannot do so through summary adjudication. The majority's interpretation jibes with neither the Commission's nor this court's decision. Moreover, it virtually destroys any usefulness of *NEPCO* as a substantive rule of *policy.*

*NEPCO* concerned the used and useful principle in general, not just as applied to one cancelled plant. In *NEPCO*, we approved the Commission's policy against permitting a utility to reap a return on the unamortized portion of its investment in an abandoned generating station. This policy is based on a principle of ratemaking upheld long ago by the Supreme Court: a utility may not include in its rate base

properties that are not "used and useful" in serving its ratepayers. *See Denver Union Stock Yard Co. v. United States,* 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469 (1938). Thus, in *NEPCO* the Commission allowed the utility to recover the money it owed on a partially constructed and then cancelled generating plant, but not to receive a return on that investment over the amortization period. Abandoned projects are neither used nor useful and therefore properly can be excluded from the rate base. Only as a result of that standard did the Commission note that a reasonable balance had been attained.

The ALJ's decision and the Commission's adoption of it were based clearly—and exclusively—on the used and useful principle. In selectively cribbing from the Commission's quote of the ALJ opinion, the majority strives to create the impression that the decision was fact-based. *See* Maj.Op. at 1184. Nothing could be farther from the truth. In reaching his conclusion, the ALJ indicated that "[t]he equitable method of handling this issue requires a balancing of the interest of ratepayers and security holders." J.A. in *NEPCO,* 668 F.2d at 1332. In balancing these interests, the ALJ made no mention of the amortization period, or the size of the investment, or any other specific fact. Nor did the Commission make mention of such facts in adopting the ALJ's findings. In rejecting NEPCO's argument that ratepayers should be required to pay a return on the expenditure related to an aborted project, the Commission simply quoted from (and thereby indicated its agreement with) the ALJ's determinations:

Ratepayers are not required to insure that a utility receive a return on all monies invested in the enterprise; ratepayers are required to pay a return on only those investments in properties that are used and useful in the public service. The argument that the security holders should be fully insulated from all risk in this matter is rejected. While a regulated utility may have a lesser degree of risk than unregulated companies that

must compete for their markets, this is not to say that it is in the public interest to shield utility security holders from all risks, including the risk that management may initiate projects that do not become productive. This is a risk of any business.

While it is clear that investors in utilities would prefer to have ratepayers absorb losses resulting from aborted projects, such preference does not constitute justification for casting the entire burden of such losses upon ratepayers.

NEP's proposal to afford rate base treatment for the unrecovered portion of this expenditure is rejected.

*NEPCO,* 8 *FERC* (CCH) ¶ 61.054, at 61,-175–76. Nothing in the *NEPCO* decision indicates that the Commission would act differently in a factually different case.

Similarly, this court's decision in *NEPCO* gave Jersey Central no reason to question the veracity of the Commission's *NEPCO* decision as establishing a substantive rule of ratemaking. The only question before us was "whether FERC's refusal to include project expenditures in the rate base, while allowing their recovery as costs over time, is a valid approach to allocating the risks of project cancellation." 668 F.2d at 1333. NEPCO complained that "[t]he sole ground for [the Commission's *NEPCO*] decision was that the expenditures for those facilities did not result in the operation of any used and useful plant." NEPCO Brief at 7. The Commission in turn defended its ruling in a justification of the used and useful rule. FERC Brief in *NEPCO* at 13–20. We held that FERC's approach was valid, without reference to the specific facts of the case, based solely on the Commission's consistent application of the used and useful doctrine. 668 F.2d at 1333–35. In rejecting NEPCO's *Hope* and takings arguments and upholding the Commission's treatment, we held that current ratepayers should bear only the legitimate costs of providing service to them; items not "used and useful" could not be included in the utility's rate base. *Id.* at 1333. Nothing in our opinion could lead Jersey Central to

believe we would have found differently had its factual situation been before us.

Significantly, at one time Jersey Central conceded this very point. In appealing the decision of the New Jersey Board of Public Utilities (BPU) to disallow recovery of the carrying charges on the Forked River investment, Jersey Central acknowledged that the BPU decision was consistent with this court's decision in *NEPCO.* Excerpts from Brief on Behalf of Appellant Jersey Central Power and Light Company, before the Superior Court of New Jersey, Appellate Division, J.A. at 22 [hereinafter Excerpts from Jersey Central Brief]. In that proceeding, Jersey Central expended its energies in attacking the reasoning of our decision and in attempting to convince the court that it should encourage the BPU to employ the "prudent investment" rate base formulation. Jersey Central was motivated by its belief that, unlike the used and useful formulation, the prudent investment approach would afford it the recovery it sought. *Id.,* J.A. at 22–26. Unsuccessful in its undertaking before the state court, Jersey Central apparently rethought the application of our *NEPCO* decision to its case. Its reconstruction does not hold up.

**B. The Commission's Generalization of the *NEPCO* Rule**

As the majority admits, at least four subsequent decisions laid down the same rule before Jersey Central filed its rates. Maj.Op. at 1184. In NEPCO's second attempt "to include in rate base the unamortized investment in abandoned generating projects," the Commission admonished that it had previously "clearly stated" that such inclusions were "improper." *New England Power Co.,* 16 FERC (CCH) ¶ 61,249, at 61,538 (Sept. 29, 1981) (citing *NEPCO* and summarily disposing of nonconforming portion of filing). In *Northern States Power Co.,* 17 FERC (CCH) ¶ 61,196 (Dec. 3, 1981), *aff'd sub nom. South Dakota Public Utilities Commission v. Federal Energy Regulatory Commission,* 690 F.2d 674 (8th Cir.1982), the Commission again held that the utility could not obtain a return on its lost investment. The case left

no room for ambiguity; Jersey Central itself conceded that in *Northern States,* "FERC made clear that its intention was that the investors receive back their entire investment but be denied all return on that investment during the amortization period." Initial Brief of Jersey Central at 19. The Commission applied the *NEPCO* rule summarily, rejecting tariff filings that sought a return on investments not "used and useful." In both *Ohio Edison Co.,* 18 FERC (CCH) ¶ 16,010 (Jan. 8, 1982), and *Central Maine Power Co.,* 18 FERC (CCH) ¶ 61,126 (Feb. 12, 1982), the agency cited *NEPCO* as its authority for the summary dispositions. These decisions thus clearly established a general rule of summary denial of non-conforming filings by the time Jersey Central made its initial filing in March 1982. *See Black Hills Power and Light Co.,* 19 FERC (CCH) ¶ 61,302, at 61,592 (June 24, 1982) (referring to rate base treatment of cancelled plants as "contrary to well-established precedent"); *see also Violet v. FERC,* 800 F.2d 280, 281 n. 2 (1st Cir.1986) (referring to NEPCO's 1982 agreement not to request reimbursement of the unamortized portion of its cancelled plant as "consistent with Commission policy") (citing *NEPCO*).

The majority belittles the import of these cases by brushing them off as "routine" and comparing them to Jersey Central's filing, which the majority characterizes as "anything but routine." Maj.Op. at 1184. This supposed distinction misses the mark. The Commission had established firm ratemaking procedure—summary disposal of unamortized costs of cancelled plants included in electric utilities' rate base filings. The procedure did not vary with "factual differences," no matter how substantial. As to the critical fact, Jersey Central stood in exactly the same position as each other utility—it wanted rate base treatment of its abandoned investment. Jersey Central had no reason to think it would not receive identical treatment—summary refusal.

C. The Natural Gas Pipeline Cases

In a laborious attempt to show that the Commission had begun to waiver in its policy, or indeed was inviting a utility to request the treatment that Jersey Central in fact sought, Jersey Central cites several gas pipeline cases. The utility maintains that it reasonably read the cases as suggesting a shift by the Commission away from the *NEPCO* rule. The majority agrees. Despite such distinguished ratification of Jersey Central's misreading of Commission precedents regarding gas pipelines, we find nothing in those cases to indicate any waivering by the Commission in its long-standing policy toward the cancelled construction projects of electric utilities.

*Trailblazer Pipeline Company,* 18 FERC (CCH) ¶ 61,244 (Mar. 12, 1982), the case upon which Jersey Central relies heavily and the majority relies exclusively, fails to validate Jersey Central's non-conforming rate filing. *Trailblazer* involved not a rate filing, but a preconstruction proceeding brought to obtain Commission certification of the appropriateness of the pipeline's financing. The Commission allowed the pipeline to recover debt service on an abandoned project because it was paid for through project financing, in which the stream of income generated by the project was the primary security for the loan. *See also Ozark Gas Transmission System,* 16 FERC (CCH) ¶ 16,099 (July 28, 1981) (approving recovery of actual debt interest for project paid for by project financing). It conditioned approval of inclusion of debt service in rate base "on applicants' waiver of their right to apply for the recovery of their equity investment in this project should it fail." 18 FERC ¶ 61,244, at 61,503.

The majority declares that *Trailblazer* "presented Jersey Central with some additional grounds for believing that the Commission would take a more flexible approach" in its case because the Commission had signalled its frustration with the disparate treatment given gas and electric companies. Maj.Op. at 1184. Yet the majority fails to substantiate the grounds for this belief. In its many permutations, the majority opinion has been unable to come

up with an interpretation of *Trailblazer* that both supports Jersey Central's position and withstands scrutiny.

*Trailblazer* does not even announce a blanket rule allowing recovery of debt service and a return of, but not on, an investment by a natural gas company. It certainly does not hold that such a rule should or could be extended to electric utilities. More important, even if *Trailblazer* were read to control Jersey Central's filing, the utility would not recover the relief it seeks. In fact, the disparity between treatment of gas and electric cases identified in *Trailblazer* is that treatment of cancelled electric plants was *more* generous than treatment of cancelled gas facilities. The majority admits as much. *Id.* at 1185.

As was pointed out in the panel's first opinion in this case, the rule for gas companies would not permit Jersey Central to recover its equity investment, the debt, the carrying charges on the debt, and the preferred stock costs, all of which it attempted to do by including the Forked River investment in its rate base. Arguing that this understanding of *Trailblazer* is erroneous, the majority maintains that the Commission "suggest[ed]" that conventionally-financed pipelines would not have to waive their right to recover the equity investment in order to recover a return. *Id.* at 1185 n. 6. We cannot locate any such suggestion in anything the Commission said. Indeed, any suggestion to be found is quite to the contrary.

In *dicta*, *Trailblazer* discussed the tariff that the Commission would consider if the pipeline opted for conventional rather than project financing. The Commission indicated that it would permit the applicant to "apply for recovery *of* the total investment in the project should it fail." 18 FERC (CCH) ¶ 61,244, at 61,504 (emphasis added). The Commission observed that the policy consideration of encouraging investment in prudent yet possibly risky projects pointed "in the direction of a consistent and more liberal allowance of abandoned plant costs in *cost of service.*" *Id.* at 61,502 (referring to amortization of abandoned projects) (em-

phasis added). This observation, however, had no bearing on the Commission's policy of excluding a current return on an abandoned plant from the. *rate base.* There is no suggestion that any utility should in addition receive a return *on* the equity portion of the investment. *See id.* at 61,-503 & n. 17. Indeed, the Commission expressed concern that even allowing a return *of* that investment creates too great an incentive for imprudent investments. *See id.* at 61,503 (stating that FERC's ratemaking procedures should "*not* promote investment in projects undertaken simply because the bill can be passed on to the ratepayers").

The majority misunderstands the ramifications of the Commission's assertion that there "is no obvious reason why the treatment of abandoned plant costs as between gas and electric companies should differ," *id.* at 61,511 n. 15. It was saying that in an appropriate natural gas case, one not paid for by project financing, amortization of abandoned plant costs should be allowed because it was already allowed in the electric company context. *See id.* (citing *NEPCO, supra,* and *Northern States Power Company, supra* ); *cf. Natural Gas Pipeline Co. v. Federal Energy Regulatory Commission,* 765 F.2d 1155 (D.C.Cir.1985) (establishing on its facts that a pipeline was not entitled to amortize its out-of-pocket expenses, to say nothing of its debt or carrying charges, for abandoned projects), *cert. denied,* —— U.S. ——, 106 S.Ct. 794, 88 L.Ed.2d 771 (1968). Jersey Central has already benefited from this investment-fostering liberal approach. Unlike gas companies, Jersey Central was allowed to recover the expenditure made on its failed construction project.

The majority inexplicably seems to elevate Jersey Central's reliance on *Trailblazer's* supposed indication of the Commission's "flexibility" to a point of independent legal significance. *See* Maj.Op. at 1185 & n. 7. Regardless of the reasonableness of the company's expectation, one must query just how much Jersey Central "relied" upon *Trailblazer* in making its filing. In

its initial brief to this court for review, the utility cited *Trailblazer* as additional support for its argument that the Commission should permit full amortization *and* a return on the debt and preferred portions of the unamortized amount. Initial Brief of Jersey Central at 20. However, it characterized the *Trailblazer* opinion as having been issued "shortly *after* Jersey's Central filing," *id.* at 8 (emphasis added), even though, as the majority notes, the opinion was published two weeks before the filing, Maj.Op. at 1185.

Whatever Jersey Central's intent, belief, or expectation, *Trailblazer* cannot carry the utility where it desperately wants to go, and where the majority is all too willing to usher it. *Trailblazer* never questions the continuing validity of the used and useful principle, which it would have to do to raise a reasonable doubt in Jersey Central's mind that the continuing validity of *NEPCO* was open to question. We therefore conclude that summary disposition of Jersey Central's initial rate filing was appropriate under settled *NEPCO* used and useful doctrine. *See* 18 C.F.R. § 385.217 (1986) (summary disposition procedure). At the time Jersey Central filed its proposed rate revision, the requirement that the rate base exclude certain unallowable items had been upheld by this court; the Commission had stated its practice of applying this requirement; and the agency had not deviated from this position. Under these circumstances, the Commission properly rejected the non-conforming portion of Jersey Central's filing pursuant to its standard policy.

Petitioner stated at oral argument that in its proceeding before the Commission it set out to test the *NEPCO* doctrine. Everyone can appreciate Jersey Central's frustration with what it believed to be an unwise and ill-conceived rule. But the proper forum for challenging an agency rule is in a regulatory rulemaking proceeding, *not* in a ratemaking proceeding. *See generally* 1 K. Davis, *Administrative Law Treatise*, § 6:1 *et seq.* (1978). FERC is now, pursuant to a Notice of Inquiry, re-evaluating its entire approach to the regulation of whole-sale electric requirements service. The agency intends to focus, in particular, on "the pricing and risk allocation policies," including its cancelled plant policy. *See* 31 FERC (CCH) ¶ 61,376 (June 28, 1985); *Regulation of Electricity Sales-for-Resale and Transmission Service*, 50 Fed.Reg. 27,604, at 67,612–14. (July 5, 1985). That is where Jersey Central should make its stand. The utility should not be allowed to convert a rate case into an involuntary rulemaking and manipulate this court into approving procedures FERC has rejected.

The majority puts this Notice of Inquiry to preposterous use. Although it buries its point in a footnote, the majority makes the remarkable assertion that the fact that the Commission has initiated this rulemaking proceeding "indicate[s]" that the agency had no "genuine rule with respect to the treatment of cancelled plants." Maj.Op. at 1185 n. 7. The fact that the Commission's regulatory policy with regard to electric utilities is evolving lends absolutely no support to the majority's and Jersey Central's contention that the agency had not established a firm rule in *NEPCO* and its progeny. An agency has every right, and indeed the responsibility, to reconsider and restructure its rules and policies when the circumstances warrant change. Regulatory policies are always in "a state of flux." *See id.* This evolution does not render the rules promulgated any less authoritative. Indeed, Congress has chosen to regulate through agencies in order to avoid the cumbersome, legislative process and to take advantage of agencies' ability to respond to everchanging industry practices and economic environments.

The Notice of Inquiry issued by the Commission cannot excuse the majority's willingness to second-guess the agency's policies. Courts have no place substituting themselves for agencies. Had Congress intended the courts to act as the supreme regulatory bodies, they would have made us subject to strictures, beyond Article III, that would preclude the freewheeling approach taken by the majority in its opinion today.

## D. The Inappropriateness of Using Rate Base Calculation to Address Utilities' Financial Concerns

The infirmity of the majority's decision extends beyond its disregard for *NEPCO* as a rule of policy regarding rate base calculation. Ratemaking is a complex process involving consideration of a myriad of factors. *See generally Regulation of Electricity Sales-for-Resale and Transmission Service*, 50 Fed.Reg. 27,604 (July 5, 1985) (discussing pricing and risk allocation policies toward electric utility requirements service). The more systematic the practice, the easier and more efficient the process can be for both the Commission and the individual utility. *See, e.g.*, 18 C.F.R. §§ 35 and 290 *et seq.* (1986) (outlining rules and procedures for filing of rate schedules and collection of cost of service information). If the majority's rationale is followed, items such as cancelled nuclear power plants will be included or excluded from utility rate bases dependent on the financial condition of the utility. Ad hoc rules for rate base composition invite a chaotic state of the law in a regulatory arena where certainty and predictability help ensure that just and reasonable rates are established.

Furthermore, rate base calculation is much too clumsy a tool for adjusting total return to accommodate the state of the utility's finances. Generally, the rate base is comprised of total capital invested in facilities minus depreciation plus cash working capital. The rate of return, on the other hand, is a weighted average of different rates applied to debt, preferred stock and common stock. Thus, the rate of return is the normal and most suitable vehicle for taking account of a given utility's fluctuating financial needs. Not surprisingly, as the Commission explained at oral argument, it is here that FERC does most of its "tinkering." *See* Maj.Op. at 1186–87. Indeed, it was through adjusting rate of return that FERC and Jersey Central settled their differences in this rate filing.

In addition, the majority's approach creates disincentives for a utility to operate efficiently. As the Commission observed, "[a] firm is more likely to work to minimize its costs if its financial health is at stake.... Thus, firms that bear significant business risk are more likely to produce efficiently than those [who] are sheltered from this risk." 50 Fed.Reg. at 27,-612. Yet, under the majority's rationale not only are producers able to shift the risk of loss onto their ratepayers, but they are more likely to be able to do so if the loss is great and they are otherwise under financial strain. A healthy utility does not get its prudently incurred but cancelled expenditure included in its rate base, but a sickly utility does.

The Commission has expressed its concern that allowing recovery of the expenditure through amortization may reduce incentives for utilities to "avoid embarking upon questionable construction projects, or to stop work on partially constructed ones after their economic value has become unclear," or "to minimize construction costs." 50 Fed.Reg. at 27,614. If the company is more likely to recover not only its out-of-pocket costs but also a return on those costs if it is in financial decline, then the incentives for efficient production are reduced even further. And, as the concurrence points out, we are not dealing with small change. *See* Sep.Op. at 1188. The disincentives are large ones. Thus, the majority's method of treating rate base calculation frustrates the Commission's goal of "achiev[ing] the most efficient allocation of resources possible." *See Northern Natural Gas Co. v. FPC*, 399 F.2d 953, 959 (D.C.Cir.1968).

The majority asserts that it is not insisting that Jersey Central receive the financial relief it seeks through a rate base adjustment. *See* Maj.Op. at 1182 n. 5. The majority protests too much. Rate base treatment of Jersey Central's cancelled plant is, of course, the very thing at issue. The utility, as stated in its filing and as credited by the majority, has presented the rate package that it alleges will provide the minimum amount necessary to avoid non-

confiscatory rates; each element of the proposed rate structure is essential. Indeed, the majority argues, in response to our point that Jersey Central had other forms of relief open to it (other than inclusion of its cancelled plant in the rate base), that other alternatives would not meet the utility's specific financial needs. *See* Maj.Op. at 1186–87. The majority cannot have it both ways, and its refusal to accept the ramifications of its opinion in this regard reveals the extent to which it is blind to Jersey Central's real motivation—nullification of the *NEPCO* doctrine.

### III. The Utility's Right to an Evidentiary Hearing

There may be times when the Commission cannot issue an interim summary disposition order even when based on a long-established settled rule. Jersey Central argues that this is such a time. It claims that the substantive policies and procedural filing requirements that the Commission established for recovery of abandoned power projects, whatever their merit for utilities facing less dire financial straits, were invalid as applied to Jersey Central's particular rate filing. The utility contends that the Commission's rate base requirements so jeopardized Jersey Central's financial integrity and long-term ability to attract capital that the Commission's order threatened to confiscate the capital that its owners had invested, in contravention of the *Hope* end result test. Accordingly, it asserts that the Commission cannot summarily apply its *NEPCO* rule; rather, it must hold an evidentiary hearing concerning proper treatment of the utility's proposed rate base items. While acknowledging the electric utility industry's need to attract investors, we find that Jersey Central presents no valid reason why these concerns justify exemption from the Commission's clear requirements. The majority obviously disagrees. It is here that the majority opinion may cause the most confusion and caprice.

Ratemaking calls for "pragmatic adjustments" clearly within the province of the Commission, which "must be free ... to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 331, 94 S.Ct. 2328, 2356, 41 L.Ed.2d 72 (1974) (quoting *Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968)). The broad discretion the Commission enjoys in its ratemaking determinations, however, must be bridled in accordance with the statutory mandate that the resulting rates be "just and reasonable." In *Hope*, the Supreme Court articulated the standard by which a reviewing court examines a challenged rate. "Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling.... If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." 320 U.S. at 602, 64 S.Ct. at 288 (citations omitted). Thus, *Hope* is a limit on judicial scrutiny, not a probing device for courts restless to enter the fray between utilities and the Commission on the actual rates to be approved.

Remarkably, the majority invokes *Hope* to direct the methods the Commission may employ in fashioning Jersey Central's rates. Our colleagues accept Jersey Central's contention that "the Commission may not *summarily* exclude an investment from the rate base when the utility has alleged that its ability to attract capital will be seriously jeopardized as a result." Maj.Op. at 1172. They therefore conclude that the company is entitled to a hearing in order to have the opportunity to prove its allegations and demonstrate that the end result of the Commission's order—were it carried out—would violate the *Hope* standards. Regardless of the propriety of the Commission's used and useful policy, the majority holds that, given Jersey Central's allegations regarding its financial status, a hearing is required in order to implement this policy. To the contrary, we find nothing in Jersey Central's initial filing and its application for rehearing that demonstrates a need for a hearing at this stage of the proceeding.

Section 205 of the Federal Power Act, 16 U.S.C. § 824d(e) (1982), provides that "the Commission shall have authority ... to enter upon a hearing" on the legality of a rate increase. This provision authorizes, but does not require, the Commission to conduct full-scale evidentiary hearings; the Commission may dispose of issues summarily if there is no need for a hearing. *See Cities of Batavia v. Federal Energy Regulatory Commission,* 672 F.2d 64, 91 (D.C. Cir.1982). In particular, a utility is not entitled to a hearing before the non-conforming portion of its rate filing is rejected, *see Southern California Edison Co. v. Federal Energy Regulatory Commission,* 686 F.2d 43, 47 (D.C.Cir.1982), or when it challenges an established policy. *See Papago Tribal Utility Authority v. Federal Energy Regulatory Commission,* 628 F.2d 235, 242 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); *Municipal Light Boards v. FPC,* 450 F.2d 1341, 1345–46 (D.C.Cir.1971); *see also* 3 K. Davis, *Administrative Law Treatise* § 14.5 at 26–27 (1980) ("When a utility's entire filing consists of a legal challenge to well-entrenched policy, there is no need for the Commission to grant the challenger a hearing."). The Commission is under an obligation to grant a hearing only if the utility raises an "issue of adjudicative fact." *See United States v. Storer Broadcasting Co.,* 351 U.S. 192, 205, 76 S.Ct. 763, 771, 100 L.Ed. 1081 (1956); *Citizens for Allegan County, Inc. v. FPC,* 414 F.2d 1125 (D.C.Cir.1969).

Had Jersey Central raised a "serious *Hope* challenge," as the majority believes it did, Maj.Op. at 1178, there would be an issue of adjudicative fact which necessitates a hearing rather than summary disposition. The issue would be whether any action taken by the Commission to reduce the rates permitted Jersey Central would produce an unjust and unreasonable end result; that is, whether Jersey Central had proposed the "minimum" non-confiscatory rates possible. In summarily excluding the non-conforming costs from the rate base, the Commission impliedly determined that the utility had raised no issue of fact.

Based on Jersey Central's allegations and the evidence before the Commission, we find this conclusion reasonable.

A. The Showing Necessary to Obtain a *Hope* Hearing

In order for Jersey Central to raise a serious *Hope* challenge, its allegations, if true, must suggest that the Commission's interim order—the exclusion of unamortized abandoned plant costs from the rate base—would result in unjust and unreasonable rates. According to the majority, Jersey Central has made the showing necessary to obtain a *Hope* hearing. Maj.Op. at 1169. The majority is convinced by the utility's allegation that "the company has been shut off from long-term capital, is wholly dependent for short-term capital on a revolving credit arrangement that can be cancelled at any time, and has been unable to pay dividends for four years." *Id.* at 1181. This proffer simply echoes the investor interest described in *Hope. See* 320 U.S. at 603, 64 S.Ct. at 288, Maj.Op. at 1171–72. A utility must do more than recite the frustration of its stockholders' interests in order to obtain a *Hope* hearing. Thus, we cannot agree with the majority that "[t]he allegations made by Jersey Central and the testimony it offered track the standards of *Hope* and *Permian Basin* exactly." *See* Maj.Op. at 1178.

We need not adopt what the majority relentlessly maintains is FERC's interpretation of the required showing—"the order would put the utility into bankruptcy"—in order to reject the showing presented by Jersey Central. *See id.* at 1175, 1177, 1179, 1180. Nor need we decide what precise allegations and evidence would ultimately comprise the necessary showing. The court need only find, as we do, that Jersey Central's showing does not suffice. There are at least three types of showings which, in our view, are crucial to any attempt to obtain a *Hope* hearing at this intermediate stage of the rate proceeding and which are largely overlooked in the majority's opinion and absent from Jersey Central's filing.

1. The Nexus Between the Rate Order and the Utility's Financial Plight

It is axiomatic that FERC is not a guarantor of Jersey Central's financial health and that a utility may even go bankrupt for reasons beyond the regulator's control. *See, e.g., Hope,* 320 U.S. at 603, 64 S.Ct. at 288. The Act and its constitutional limits ensure that the governmental ratemaking process does not "produce arbitrary or unreasonable consequences." *Permian Basin,* 390 U.S. at 800, 88 S.Ct. at 1377. They do not protect the utility from market forces. *Market Street Railway Co. v. Railroad Commission of California,* 324 U.S. 548, 567, 65 S.Ct. 770, 779, 89 L.Ed. 1171 (1945). Establishing a link between a utility's bad health and the actions of the regulator is thus essential to raising a viable *Hope* claim.

Jersey Central has not established this critical nexus. It simply complains that the government's ratemaking actions are the source of its problems; our colleagues never question this assumed causal connection. An examination of the evidence laid before FERC, however, leads us to doubt the validity of this assumption.

In its present financial circumstances, Jersey Central bears greater resemblance to the failing Market Street Railway Company than it does to the Hope Natural Gas Company, "which had advantage of an economic position which promised to yield what was held to be an excessive return on its investment and on its securities." *Market Street,* 324 U.S. at 566, 65 S.Ct. at 779 (finding investor considerations advanced in *Hope* "inapplicable to a company whose financial integrity already is hopelessly undermined"). Jersey Central had not been able to pay dividends for the four years prior to its filing; its access to capital had been hampered for about as long. Essentially, the utility is asking the Commission to relieve its economic miseries by approving dramatically increased rates. *See* Testimony of Dennis Baldassari, J.A. at 34 (testifying that the continuation of the present rate "will prolong the Company's inability to restore itself to a recognized level of credit worthiness"); *compare Permian Basin,* 390 U.S. at 812, 88 S.Ct. at 1384 (noting that the rates proposed would *"maintain* the industry's credit and *continue* to attract capital") (emphasis added). Jersey Central's problems appear to stem largely from the operations of the free market, perhaps exacerbated by the actions of other regulators. FERC cannot be made responsible for curing those ills.

The Supreme Court has enunciated this principle quite frankly:

> The due process clause has been applied to prevent governmental destruction of existing economic values. It has not and cannot be applied to insure values or to restore values that have been lost by the operation of economic forces.

*Market Street,* 324 U.S. at 567, 65 S.Ct. at 780.

The entire electric utility industry faces a "financial crisis." *See* Excerpts from Jersey Central Brief, J.A. at 26 n. 19. As Baldassari remarked, the October 1973 oil embargo and the impact of inflation are problems generic to the industry. Testimony of Dennis Baldassari, J.A. at 33. Those utilities that invested heavily in nuclear facilities were particularly hard hit, not in the least by adverse public and political attitudes to nuclear power and its attendant dangers. *See id.* at 33–34. Any fair reading of Baldassari's testimony before FERC leads to the conclusion that economic forces, rather than any action on the part of FERC, have strapped Jersey Central into the financial straightjacket.

It should be noted that Jersey Central's investment portfolio places it in a uniquely tight predicament. Jersey Central is a subsidiary of the General Public Utilities Corporation, the electric utility that has among its "prudent" investments the Metropolitan Edison Company and the infamous Three Mile Island (TMI) nuclear generating plant. Jersey Central intimates that the horrendous financial burden caused by the TMI–2 accident was the pivotal force in suspending construction of Forked River. *See id.* Presumably it also landed a heavy blow to

Jersey Central's credit worthiness and financial integrity.

The market is not the only force potentially at work against Jersey Central. Many regulatory bodies have influence over Jersey Central's economic destiny; therefore, the utility must effectively link its financial distress to FERC. This showing is particularly important, since the federal government is responsible—on the whole—for the value of only about ten percent of electricity sales in the United States. The states regulate the major part of the utility business. As noted earlier, the New Jersey BPU has historically refused Jersey Central a return on unproductive facilities. *See* Excerpts from Jersey Central Brief, J.A. at 17 (blaming the company's financial woes on BPU's lack of rate relief). In addition, there are other federal agencies who share regulatory control with FERC. The Nuclear Regulatory Commission, for example, prohibited the company from starting up the unharmed TMI-1 generator, thereby severing the company's access to its prime source of desperately needed service and revenues.

If Jersey Central's problems derive from economic forces or from the actions of other regulatory bodies, then even FERC's full rate base treatment of the amounts at issue will not alter the company's inability to pay dividends or obtain long-term credit. At a minimum, a company claiming an unconstitutional taking should have to show that FERC's actions caused or substantially contributed to the conditions alleged to be the result of the taking. Jersey Central has made no such showing. In fact, it appears as if the Commission's interim rate-reducing order is a small factor in the forces contributing to the utility's financial dilemma.

The majority takes the remarkable position that the Commission must alter its ratemaking procedures even if the utility can only show that the Commission's action only affects "a minor portion of Jersey Central's business." Maj.Op. at 1182 n. 5. Such a position is untenable. From this perspective, the agency would be obliged to abandon its ratemaking procedures in every industry which experienced financial hardship, regardless of the principal causes of those conditions. Neither *Hope* nor the due process clause requires as much. *See Market Street*, 324 U.S. at 567, 65 S.Ct. at 779.

2. The Effect on Consumers

The burden is ultimately on Jersey Central to establish that the return allowed by FERC is constitutionally inadequate; part of the showing necessary to raise an issue of fact must include attention to the consumer interests which form an important part of the *Hope* balancing test. Under *Hope,* a taking occurs only when the agency has misbalanced the interests of investors and consumers. As the Court stated in *Permian Basin,*

> [t]he Commission cannot confine its inquiries [to the *Hope* investor criteria]; it is instead obliged at each step of its regulatory process to assess the requirements of the broad public interests entrusted to its protection by Congress. Accordingly, the "end result" of the Commission's orders must be measured as much by the success with which they protect those interests as by the effectiveness with which they "maintain ... credit and ... attract capital."

390 U.S. at 791, 88 S.Ct. at 1372.

The consumer interest essential to the just and reasonable balance is that of not being subjected to exploitative rates. The Commission stands as the watchdog providing "a complete, permanent and effective bond of protection from excessive rates and charges." *Id.* at 795, 88 S.Ct. at 1374 (quoting *Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312 (1959)). Thus, this court has described utility consumers as the agency's "prime constituency." *See Maryland People's Counsel v. FERC,* 761 F.2d 780, 781 (D.C.Cir.1985) (citing *Hope,* 320 U.S. at 620, 64 S.Ct. at 296). The exact boundaries of an exorbitant rate are indeterminate. Ultimately, however, they must relate to the cost of service, *see*

*Farmers Union Central Exchange, Inc. v. FERC*, 734 F.2d 1486, 1502 (D.C.Cir.) (citing *Hope*, 320 U.S. at 602–03, 64 S.Ct. at 287–88), *cert. denied sub nom., Williams Pipe Line Co. v. Farmers Union Central Exchange, Inc.*, 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 298 (1984), and the distribution of associated risk, *see Washington Gas Light Co. v. Baker*, 188 F.2d 11, 20 (D.C.Cir.1950).

Jersey Central argues that the agency has discriminated against its investors' interests, but it does not address how the Commission's balance weighed the consumer interests. More significantly, it does not show that paying more attention to its investors' interests would not exploit the consumer. *See* 18 C.F.R. § 35.13(e)(3)(1986) (stating that the utility has the burden of "establishing that the rate increase is just and reasonable and not unduly discriminatory or preferential").

The majority is in seeming confusion as to the showing the company made with regard to protection of consumer interests. It states, without support, that "Jersey Central submitted figures and testimony to support its claim that ... its proposed rates would not exploit consumers." Maj.Op. at 1180. Yet, in fact, Jersey Central itself never made this "claim"; it never broached the issue. The majority resurrects an unpersuasive argument in support of its contention—namely, that "the rates proposed in its filing would remain lower than those of neighboring utilities." *Id.* at 1181; *see Jersey Central Power & Light Co. v. FERC*, 768 F.2d 1500, 1502 (D.C.Cir.1985). Perhaps this point would lend support to the majority's assertion were there a competitive market for electricity service. But of course there is no competition in this market; electric utilities are natural monopolies subject to rate regulation. "What rates are 'just and reasonable' will in general depend on a utility's legitimate costs, and those costs can of course vary widely even among neighboring utilities.... That some utilities with monopoly markets adjacent to Jersey Central's are allowed to charge more than Jersey Central thus presumably signifies noth-

ing more than that Jersey Central has access to cheaper sources of power, or for some other reasons has fewer legitimate costs." 768 F.2d at 1512 (Mikva, J., dissenting). It certainly does not show that Jersey Central's proposed rates would not exploit *its* customers.

The majority admits that "it is impossible for us to say at this juncture whether including the unamortized portion of Forked River in the rate base would exploit consumers *in this case*." Maj.Op. at 1181. Since Jersey Central alleges that its proposed rate schedule would yield the lowest nonconfiscatory rate possible, how can the majority then say that the company has made a *Hope* showing? Without a showing that its filing would *not* exploit consumers, Jersey Central has not presented allegations suggesting that the rate order does not meet the requirements of *Hope*. *Contra id.* at 1181. Absent such allegations, the utility is not entitled to a *Hope* hearing.

3. The Reasonableness of the Overall Return Allowed on the Forked River Project

Regardless of the formulation employed, the rates fixed by the Commission may not shift the risk of loss onto the consumer and then exact the practice of the loss from him in the event it occurs. Such a double taxing "would clearly violate the consumer interest against 'exorbitant' rates." *Washington Gas Light*, 188 F.2d at 20. Before questioning the application of the used and useful rule, therefore, it is important to discover if the investors in Forked River have already been compensated for the risk that the project would be cancelled before the investment in it was entirely recovered. *See id.* at 19–20.

The total return received by a utility is a function of both the rate base and the rate of return, and the total return on any given investment is a function of the allowable return over a period of time. Jersey Central has focused only on the "used and useful" method of rate base calculation

with no attention to the rate of return, especially to the manner in which that return may arguably have already compensated its investors for the exclusion of the cancelled investment from the rate base. Without an explanation of the company's historic allowed return, it is impossible to judge the reasonableness of the Commission's treatment of the Forked River plant.

In *Washington Gas Light*, the case so heavily relied upon by the majority, this court upheld a departure from the "used and useful" method of rate base calculation to the "prudent investment" approach. However, before approving the application of that formulation to the abandoned plant in that case, we remanded for further proceedings by the Commission. Contrary to the majority's explanation, we did not require findings concerning the "financial health" of the company. *See* Maj.Op. at 1177. A remand was necessary because Judge Bazelon realized that it was possible that the investors had already been compensated for the risk that the plant at issue would be abandoned. As Judge Bazelon observed, "[i]t seems likely ..., in view of the prevalence in the past of the doctrine that abandoned property would not be included in the rate base (regardless of whether [rate orders] had resulted in complete recovery to the investor), that investors had been compensated for the risk of obsolescence." 188 F.2d at 20. Thus, it was possible that the rate of return allowed the company in earlier years—if properly calculated to reflect the risks of the utility business—would have compensated the company in advance for the risk that it would not obtain full rate base treatment of its investment later on. If the rate of return had served that risk compensation function, allowing additional recovery by switching rate base formulations midstream would overcompensate the utility and exploit the consumers. *Id.* at 19–20.

Jersey Central has made no allegations regarding the prior treatment of the Forked River plant in its approved rate of return. *Compare* Testimony of Dennis Baldassari, J.A. at 35 ("[T]he rates of return allowed in previous regulatory pro-

ceedings were never intended to compensate the investor for the risk of exposure to the costs of decontaminating TMI-2."). If Jersey Central has been compensated for the plant all along because its rate of return has historically been set in a world where one of the risks of being a utility is having an investment declared not to be "used and useful," then FERC has probably fulfilled its obligations under *Hope*.

In sum, in order to obtain a *Hope* hearing, Jersey Central must show that, due to the Commission's actions, it is in need of protection at this phase of the ratemaking process. That showing is conspicuously missing. Without it, the court has no business calling upon the Commission to alter its ratemaking procedures and provide a hearing at this interim stage. Once again, a protective device—the *Hope* end result test—is being used as a first strike weapon.

**B. Limits of a "Just and Reasonable" Rate**

In that Jersey Central is not entitled to a *Hope* hearing, it would normally be thought unnecessary to consider what the utility would have to prove, were it granted a hearing, in order to establish that the Commission's rates are confiscatory. The concurrence's attempt to analyze the evidence presented, while thoughtful, is premature. Because of breadth of the majority's opinion today, however, we are compelled to discuss the issue.

The real mischief of today's decision lies not in the majority's belief that the utility has raised an issue of fact necessitating a hearing, but in its determination that Jersey Central has actually made out a case of constitutional confiscation. As Justice Douglas remarked, "he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Hope*, 320 U.S. at 602, 64 S.Ct. at 288. The majority believes that Jersey Central can meet this burden. We simply cannot swal-

low the majority's assertion that "it is probable that the facts alleged [by Jersey Central], if true, would establish an invasion of the company's rights." *See* Maj.Op. at 1169. In our view, it is beyond cavil that Jersey Central has not presented allegations which, if true, would establish that the Commission's orders result in unjust and unreasonable rates.

Despite the majority's seeming confidence, the precise contours of this required showing are unclear. The just and reasonable statutory standard is imprecise. As this court once explained, "the words themselves have no intrinsic meaning applicable alike to all situations." *City of Chicago v. FPC*, 458 F.2d 731, 750 (D.C.Cir.1971) (quoting *City of Detroit v. FPC*, 230 F.2d 810, 815 (D.C.Cir.1955)), *cert. denied*, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). Congress itself has provided no formula for determining an unjust and unreasonable rate. *Hope*, 320 U.S. at 600, 64 S.Ct. at 286. Cases subsequent to *Hope* have loosely defined this "deliberately broad" standard as drawing a "zone of reasonableness in which rates may properly fall. It is bounded at one end by the investor interest against confiscation and at the other by the consumer interest against exorbitant rates." *See, e.g., Washington Gas Light*, 188 F.2d at 15. Thus, the only way that a rate may fall outside the zone of reasonableness, from the utility's point of view, is if it is so low that it amounts to a unconstitutional taking under the fifth amendment. *See FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942).

Ascertaining what constitutes a taking in the rate regulatory context is difficult, in part because there is no deprivation of typical property interests, the conceptual cornerstone of takings law. The Supreme Court has repeatedly stressed that price fixing does not effect an uncompensated taking merely because investors are denied their expected return. Indeed, even in traditionally competitive industries, "loss of future profits—unaccompanied by any physical property restrictions—provides a slender reed upon which to rest a takings claim." *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979).

In *Permian Basin*, the Court restated the *Hope* doctrine as follows:

Price control is "unconstitutional ... if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt...." Nonetheless, the just and reasonable standard of the Natural Gas Act "coincides" with the applicable constitutional standards, and any rate selected by the Commission from the broad zone of reasonableness cannot be attacked as confiscatory.

Accordingly, there can be no constitutional objection if the Commission, in its calculation of rates, takes fully into account the various interests which Congress has required it to reconcile.

390 U.S. at 769–70, 88 S.Ct. at 1361 (citations omitted).

*Permian Basin* teaches that if the Commission reasonably balances consumer and investor interests, then the resulting rate is *not* confiscatory. *Id.* at 770, 88 S.Ct. 1361. The separate opinion ably translates this into a working definition of a confiscatory rate: it exists when "an unreasonable balance has been struck in the regulation process so as unreasonably to favor ratepayer interests at the substantial expense of investor interests." Sep.Op. at 1189. The majority appears to agree with the teaching of *Permian Basin*. *See* Maj.Op. at 1177–78. The lesson it gleans, however, is incongruous. According to the majority, balancing competing interests is not enough; a rate is confiscatory if it does not *satisfy* the "legitimate investor interest" outlined by the Court in *Hope*. Maj.Op. at 1177–78, 1180, 1181 n. 3, 1181–82 (insisting that the factors outlined in *Hope* describe a taking). This interpretation of *Hope* and *Permian Basin* is implausible.

The majority's assessment of Jersey Central's showing evinces a fundamental misunderstanding of the context in which the *Hope* Court discussed investor interests. It specified the interests at issue but did not require that rates fulfill them in order

to be non-confiscatory. In *Hope*, the Court faced an assertion by the utility that the rates fixed by the Commission were so low as to be unjust and unreasonable. In testing this challenge, the Court essentially questioned whether the utility's shareholders had anything to complain about. The Court examined what was "important" "from the investor or company point of view" and found that the rate at issue fully satisfied any legitimate investor interest. 320 U.S. at 603, 64 S.Ct. at 288. Accordingly, the Court held that the rate could not be condemned from the investor viewpoint. *Id.* at 64 S.Ct. at 288, 289. One year later, Justice Jackson, speaking for a unanimous Court, refuted the majority's interpretation of the Court's holding in *Hope*: "All that was held was that a company could not complain if the return which was allowed made it possible for the company to operate successfully." *Market Street*, 324 U.S. at 566, 65 S.Ct. at 779. The *Hope* Court did not define "unjust or unreasonable"; nor did it articulate when a rate would be confiscatory. It certainly did not hold that the end result could be condemned if the investor criteria defined in the case were not fulfilled. Indeed, it expressly noted that its holding made no suggestion that more or less might not be allowed. 320 U.S. at 603, 64 S.Ct. at 288; *see Market Street*, 324 U.S. at 566, 65 S.Ct. at 779.

This understanding of *Hope* is the only way to reconcile the Court's recitation of investor interests with its avowal that "regulation does not insure that the business shall produce net revenues." *See Hope*, 320 U.S. at 603, 64 S.Ct. at 288 (quoting *Natural Gas Pipeline*, 315 U.S. at 590, 62 S.Ct. at 745). Investor interests are only one factor in the assessment of constitutionally reasonable, therefore non-confiscatory, rates. *Permian Basin*, 390 U.S. at 769, 88 S.Ct. at 1361. In any instance, the rate must also "provide appropriate protection to the relevant public interests, both existing and foreseeable." *Id.* at 792, 88 S.Ct. at 1373. A just and reasonable rate which results from balancing these conflicting interests might not provide "enough revenue not only for operating expenses but also for the capital costs of the business ... includ[ing] service on the debt and dividends on the stock." *See Hope*, 320 U.S. at 603, 64 S.Ct. at 288.

The Court made this abundantly clear in *Market Street*. The Commission rate order in *Market Street* was claimed to be confiscatory. 324 U.S. at 562, 65 S.Ct. at 777. Like Jersey Central, the complaining company asserted that *Hope* "entitled [it] to a return 'sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital' and to 'enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed.'" *Id.* at 566, 65 S.Ct. at 779 (quoting *Hope*, 320 U.S. at 603, 605, 64 S.Ct. at 288, 289). The Court dismissed the argument out of hand. In approving a rate that concededly consigned the company to operating at a loss, the Court made clear that a just and reasonable rate might not satisfy the investor "considerations" expounded in *Hope*. At the very least, the Court revealed that the *Hope* test does not guarantee rates that are fixed to provide a return "on an investment after it has vanished, even if once prudently made, or to maintain the credit of a concern whose securities already are impaired." *Id.* at 567, 65 S.Ct. at 780.

Neither the regulatory process nor the fifth amendment shelter a utility from market forces. *See id.* Thus, contrary to the majority's intimations, rates do not fall outside the zone of reasonableness merely because they do not enable the company to operate at a profit or do not permit investors to recover all their losses.

The zone of reasonableness can be viewed as circumscribing the appropriate allocation of costs and benefits in the regulatory context. In an unregulated environment, the customer would not be deemed a risk-taker. He invests no capital in the enterprise and therefore bears neither the upside nor the downside risk. The investors are the risk-takers. Under price regulations, which affords the utility a "natural monopoly" on service, some of the risk at

either end of the spectrum is shifted onto the ratepayer. The transfer, however, is not so dramatic as to relieve the stockholder of the entire risk of loss.

Application of this principle is readily apparent in the Commission's current treatment of electric utility plants, investments prudent when made but sometimes frustrated in fruition. If the investment is successful, the customer benefits from controlled rates for the service provided. But the ratepayer also shares the costs if the investment fails; he must pay for the expenditure made on an unproductive facility from which he obtains no service. From the investor's viewpoint, price regulation cabins both his upside and downside risk. He cannot collect the windfall benefits if the project is a boon; he does not bear all costs if the project is a bust. Electric utility stockholders do not lose equity in the non-serviceable facility, as they might in the marketplace. They simply do not procure a return on the investment.

The majority quibbles with this risk allocation; it would prefer a world in which the investor is guaranteed a return on his investment, if prudent when made. *See* Maj.Op. at 1180–81 & n. 2. Its resultant holding today is directly at odds with fundamental principles laid out in *Hope* and its progeny. Adherence to the majority's insistence on the inclusion of prudent investments in the rate base would virtually insulate investors in public utilities from the risks involved in free market business. *See* Sep.Op. at 1190. This would drastically diminish protection of the public interest by thrusting the entire risk of a failed investment onto the ratepayers. *See id.* at 1190. Jersey Central and the majority would convert utility stockholders from risk-takers into annuity holders. *See* Excerpts from Jersey Central Brief, J.A. at 18 (analogizing its suggested "cost-sharing" to a levelized mortgage or annuity). Neither *Hope* nor the fifth amendment takings clause sanctions such radical results. *Cf. Hope*, 320 U.S. at 603, 64 S.Ct. at 288 (stating that the "return to the equity owner should be commensurate with returns on

investments in other enterprises having corresponding risks").

In any event, this court should not ordain the drastic risk shifting that Jersey Central advocates in its filing. The proper allocation of risk between shareholders and ratepayers is a serious ongoing question. *See supra* page 1202. It raises cross-cutting issues too broad to be ventilated in a single rate proceeding. "The importance of this issue ... transcends the impact on a single jurisdictional utility." *New England Power Co.*, 32 FERC (CCH) ¶ 61,453, at 62,042 (Sept. 30, 1985). The majority's conclusion that the allocation reached by the Commission may be unconstitutional on the facts alleged has serious and troubling implications, especially for the twenty-five states that currently exclude cancelled facility expenses from a utility's rate base.

IV. HEARING ON THE ALTERED RATE FILING

As we have indicated, the Commission reasonably applied its settled rate base filing rule to Jersey Central according to its established summary disposition procedures. Nothing in Jersey Central's allegations automatically entitled it to a hearing. The utility was entitled to, and was afforded, a hearing on its proposed rate of return on the conforming items in its rate base. Jersey Central nevertheless makes one additional complaint against the Commission. In its final challenge, Jersey Central objects to the Commission's refusal to entertain the utility's attempt to inflate the rate of return proffered in its initial filing. This is yet another move by Jersey Central designed to convince this court to endorse its skirting of valid agency procedures.

In rejecting Jersey Central's plea, the Commission invoked its long-standing rule that "utilities may not present a 'moving target' by offering alternative justifications for previously filed rates." 20 FERC (CCH) ¶ 61,108, at 61,182. As this court noted in its original opinion, this rule is not arbitrary. It is justified by the "administrative necessity of closing the books at a time certain," as well as the need for a "mechanism to prevent utilities from delay-

ing refund orders by offering alternative justifications for the rate increases [they have] filed. FPC staff and intervenors cannot be expected to follow a moving target." *New England Power Co. v. FPC*, No. 75-1379, slip op. at 3 (1st Cir. Nov. 13, 1975), *cited* in 20 FERC (CCH) ¶ 61,108, at 61,182.

The majority never questions the Commission's authority to implement this rule. Rather, it questions the appropriateness of its application in Jersey Central's case. The majority seems to believe that the Commission's refusal to grant a hearing on the higher rate of return stripped petitioner of any chance to plead its case and obtain the rates it desired. Despite the majority's protestations to the contrary, Jersey Central had sufficient opportunities to seek the revenues it requested. We are therefore unpersuaded by the utility's contention that it was denied a fair hearing.

As noted at the outset, the utility had at least two separate opportunities to raise its concerns and to request the full rate increase anticipated by its rejected filing. Either approach would have raised an issue of fact, precluding summary disposition. First, Jersey Central could have filed *initially* for a higher rate of return on its used and useful property, or for a shorter amortization period on its Forked River investment. Because a shorter amortization period would allow the utility to recover its investment sooner, it would have had the same effect of increasing total return as did Jersey Central's attempt, flatly contradicted by the clear precedent in *NEPCO* and later cases, to increase the size of the rate base. Indeed, Jersey Central concedes this point. If the utility had followed *NEPCO*, and supported its proposed rate increase by filing for amortization of its investment in cancelled projects over five years instead of fifteen, rates higher than those it initially proposed would have been justified.

Second, Jersey Central could have made the same requests by *refiling* its rates, using a proper rate base. This new filing, of course, could not have stood alone without supporting exhibits and affidavits. As

the Commission observed, "the company's [initial] case-in-chief did not include testimony seeking to support a return other than 19% based on any alternative scenario of events, including summary disposition of rate base items." 20 FERC (CCH) ¶ 61,-108, at 61,182. In order to recover a higher return, petitioner would be required to offer cost and market data at the time of their filing that would support that rate of return. *See* 18 C.F.R. § 35.13(e) (1986) (testimony and exhibits supporting filing of changes in rate schedules).

Where the majority reads "in the [rehearing denial] order [that] the Commission made it clear a fresh filing would be futile" escapes comprehension. *See* Maj.Op. at 1187. The utility certainly did not get that message. The following exchange from *en banc* oral argument amplifies Jersey Central's recognition that it was free to submit a new rate filing and thereby obtain a hearing:

COURT: But you could have put in a new filing, couldn't you?

COUNSEL: We could have, sir, but . . .

COURT: At any time, even now?

COUNSEL: [W]e could but we believed then and we believe today that that precedent was wrong and we would not have had an opportunity to—

COURT: That is really what I wanted to clear up. Your concern really is you strongly disagree with the *NEPCO* precedent—

COUNSEL: Yes, we do, sir.

COURT: —I understand that, but as far as you are concerned the use of the useful rule as applied in *NEPCO* is a bad idea and you would like this Court to change its mind.

COUNSEL: Yes, sir, no question about it.

Tr. at 8.

As an alternative to submitting a different rate filing, Jersey Central could have asked for an individualized exemption from the *NEPCO* rule. The Commission's filing requirements provide that "[i]f any filing does not comply with any applicable stat-

ute, rule, or order, the filing may be rejected, unless the filing is accompanied by a motion requesting a waiver of the applicable requirement of a rule or order and the motion is granted." 18 C.F.R. § 385.-2001(b)(1) (1986). By providing this waiver process, the Commission exercises its inherent power to relax, modify, or waive its filing requirements. *See Papago Tribal Utility Authority*, 628 F.2d at 247; *Municipal Electric Utility Association v. Federal Power Commission*, 485 F.2d 967, 975 n. 28 (D.C.Cir.1973). Jersey Central did not move for such an exemption.

As its responses at oral argument illustrate, Jersey Central declined these multiple opportunities because it wanted to challenge the *NEPCO* rule directly, and none of the permissible options allowed it to do so. The hearing it would have obtained had it made a new filing would not have enabled it to address the *NEPCO* doctrine; nor would the filing of a complying tariff in the first instance have provided that vantage. Similarly, merely asking for an exemption would in no way threaten the viability of the doctrine. The majority demonstrates that such a "characterization" of the utility's filings would be "an unreasonable one," Maj.Op. at 1185, but no characterization is necessary. Jersey Central plainly stated its purpose and acted upon it.

Jersey Central could have sought review of what it perceives as an unsound rule without trampling on the Commission's filing policies and procedures and without asking this court to become involved. It could have petitioned the Commission for a rulemaking. NEPCO took this approach in its 1985 submission for filing of a proposed rate increase. *See New England Power Co.*, 32 FERC (CCH) ¶ 61,454 (Sept. 30, 1985) (Phase II). NEPCO "request[ed] that the Commission reexamine its policy regarding the treatment of the costs of cancelled plant." *Id.* at 62,042 (citing *NEPCO*). Unlike Jersey Central, however, NEPCO did not factor its suggested treatment of abandoned plants into the rates it proposed; rather, it sought only a prospective change in the policy. *Id.* at 62,043 n. 5. In this way, the Commission

was able to begin reexamining *NEPCO* "as well as the economic and legal underpinnings for a cancelled plant policy" in the rulemaking context. *Id.* at 62,042; *see also Pennsylvania Electric Co.*, 34 FERC (CCH) ¶ 61,141, 61,244 n. 8 (Feb. 4, 1986) ("[A]ny change in Commission policy would be prospective only, and utilities are required to adhere to the precedent established in [*NEPCO*] pending reconsideration of our policy."); *New England Power Co.*, 35 FERC (CCH) ¶ 61,353 (June 18, 1986) (denying motion to limit generic scope of NEPCO Phase II hearing).

In light of these opportunities, deliberately avoided, we cannot question the reasonableness of the Commission's application of its rule against presenting a "moving target." Of course, we do not suggest that an agency may implement any policy through any procedure, no matter how unreasonable, and compel the applicant to adhere to them in order to preserve its right to seek relief from the agency. We find only that the Commission acted validly in requiring Jersey Central to follow reasonable policy and filing requirements. The measure of their reasonableness is that they afforded Jersey Central ample opportunity to contend that, taking its balance sheet and troubled history of investments into account, the total return it requested was just and reasonable. They also provided the company with a platform for advocating the discontinued application of the used and useful doctrine to cancelled electric utility facilities. Given these opportunities, Jersey Central cannot seek from this court the relief and the individualized attention to its financial plight that it could have obtained from the Commission.

## CONCLUSION

This is a case of modest proportions about one segment of the sweeping rate-making responsibilities that Congress has entrusted to the Commission. Like all arms of the government, the agency must abide by its statutes and by the constitutional prohibition against taking property

without due process of law. But the due process claims of a regulated utility are not coupons which can be exchanged for a hearing at a time, place, and manner of the utility's choosing. Such an approach would wreak havoc with the agency's ability to administer a complex rate regulation system that must assess many rate filings annually.

There may indeed be times when the Commission is not free to employ the used and useful principle in a summary fashion. However, Jersey Central has not made the case for its exception. Its allegations do not raise a question of fact sufficient to trigger a *Hope* hearing before application of well-settled, court-approved ratemaking procedure and policy. The concerns about financial integrity and investor return that Jersey Central held in reserve for a hearing challenging the *NEPCO* rule should have been raised by following the Commission's established rules and procedures. We express no view on substantive rate-base requirements that may come before this court in another case; we find only that on these facts the Commission was not obligated to hold a hearing before entering its interim rate-reducing order. The Commission's administrative processes offered ample opportunities for Jersey Central to request and present supporting evidence for whichever rate of return and amortization period the utility deemed necessary to preserve its financial integrity, and to seek review of the *NEPCO* doctrine. Jersey Central chose not to avail itself of these opportunities, and now cries foul.

There is, in the end, only one reason that Jersey Central wants its hearing *before* the unamortized portion of its unproductive investment is excluded from the rate base. That timing is the only means it perceives as enabling it both to launch its frontal attack on the Commission's *NEPCO* doctrine and to immediately reap the rewards of any victory in the battle. The majority's sympathy for Jersey Central appears driven by its agreement that the used and useful doctrine is outdated and should be replaced with a pure prudent investment approach. *See* Maj.Op. at 1175, 1180–81

& n. 2. By granting a hearing to Jersey Central at this stage of the long and complex ratemaking process, the majority provides the utility a forum in which to argue its causes. But it also interferes with the Commission's discretion in implementing ratemaking policies and procedures. It thereby threatens the well-held maxim that the Commission is "not bound to use any single formula or combination of formulae in determining rates." *See Hope*, 320 U.S. at 602, 64 S.Ct. at 287.

In an era of heightened deference to administrative decisions and procedures, this court especially ought to be sensitive to the line between legitimate judicial review and judicial substitutions for agency processes. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Vermont Yankee, supra.* The majority has reordered the very filing procedures that FERC may prescribe, has redirected the kinds of hearings in which FERC may consider changes in its policies and, worst of all, has thrust the courts back into the very complicated forest of making the rates that regulated industries may charge. We ignore at our peril the hard-learned lessons of restraint expressed by the Supreme Court in *Natural Gas Pipeline* and *Hope.* The majority would have us relive that painful period.